609 F.2d 702
 21 Fair Empl.Prac.Cas. 8, 21 Empl. Prac. Dec.
P 30,326
James B. WRIGHT, on behalf of himself and all others
similarly situated, Appellant,
v.
NATIONAL ARCHIVES AND RECORDS SERVICE, etc., et al., Appellees.
 No. 77-1543.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 9, 1979.
Decided Oct. 19, 1979.
 
 William S. Moore, Washington, D. C. (Wendy S. White, Shea & Gardner, Washington, D. C., on brief), for appellant.
 David Dart Queen, Asst. U. S. Atty., Baltimore, Md. (Jervis S. Finney, U. S. Atty. and Thomas L. Crowe, Asst. U. S. Atty., Baltimore, Md., on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, and WINTER, BUTZNER, RUSSELL, WIDENER, HALL and PHILLIPS, Circuit Judges, sitting en banc.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 James B. Wright, a black civil service employee of the National Archives and Records Service appeals from a judgment denying any relief in his action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f)(3) and 2000e-16(c) alleging discrimination on the basis of race in certain personnel actions taken in relation to his federal employment.[1] Accepted with two other black and one white fellow employees into a training program designed to qualify the trainees for promotion to higher civil service grades, Wright was evaluated unqualified for a second promotion at its end. When he declined to accept a proffered special extension of training to see if he might later qualify for promotion, he was removed from the program. Alleging discriminatory personnel actions taken during the course of the training program and in the failure to promote him at its conclusion, he sought, with other relief, promotion and back pay at the higher grade. Following a bench trial, the district court concluded that no violation of Title VII had been established.[2] We agree and affirm.[3]
 
 
 2
 * The Archives Specialists Training Program was instituted in 1968 by the National Archives and Records Service at the Washington National Records Center to develop personnel to fill the positions of supervisory archives technician and archives specialist. At its outset, applicants were required to be graduates of a four-year college and to have passed the Federal Service Entrance Examination. The program covered a two-year period and applicants were required to enter at the grade level GS-5. Those who successfully completed the first year would be promoted to GS-7; those who successfully completed the second year to GS-9. Any applicant who had already attained a grade level higher than GS-5 had to drop back to GS-5 to enter the program. Successful graduates of the program would be assigned to positions as supervisory archives technicians or as archives specialists.
 
 
 3
 In 1969 an investigation into possible racial discrimination at the Washington Records Center was conducted. A report documenting the existence of discrimination resulted. Following this, the requirements that applicants to the training program be college graduates and have passed the Federal Service Entrance Examination were dropped. Thereafter, black employees of the Archives and Records Service were actively recruited for the training program as part of the Agency's Equal Employment Opportunity Affirmative Action Program. Among those recruited was plaintiff James B. Wright.
 
 
 4
 On April 19, 1970, Wright signed a training agreement and entered the program. He was not a college graduate. Since 1957, he had been employed by the General Services Administration and the National Archives and Records Service. Classified as a GS-6, he had to accept a grade reduction to GS-5. He was the first black to enter the program. In May 1970, three other members of the training class were accepted: Ernest Nolan, a black college graduate; Robert Sistare, a black without a college degree; and Orace Whitelock, a white with a college degree.
 
 
 5
 During the progress of this "1970 class" of four through the training program there occurred a series of incidents which, though not all central to Wright's specific claims of discrimination, bear significantly upon resolution of those claims. The first involved work space assigned to the trainees. Whitelock, the sole white trainee, was the first of the class to begin the program. When he arrived, the area where the trainees were to work was under construction, so he sat in the same cubicle with other trainees from earlier classes, as directed by a superior. When Wright arrived, he asserts that he either had to erect his own cubicle or was assigned to one that had just been constructed by someone else. The other black trainees were seated with Wright. After the trainee or trainees (the number seems to have varied) with whom Whitelock sat had graduated, Whitelock had his cubicle to himself. After the blacks complained about the apparently segregated working space conditions, Whitelock's desk was moved into the same vicinity as theirs. This was some two or three months after the program began.
 
 
 6
 The second incident involved the procedures by which the trainees were rotated through the various branches of the Service. During the course of the program, each of the trainees was supposed to rotate through each of the branches twice. Wright complains that whereas Whitelock was put into the rotation immediately, he and Sistare were not. Be that as it may, the design was generally followed. Wright certainly made the full rotation twice. The type of work assigned to the trainees in each branch was apparently determined by whoever was supervising them at the time and probably depended on what was available to be done. The trainees did not all follow the same rotation schedule. Wright contends that Whitelock received more challenging assignments which better prepared him for a managerial position. The Manpower Officer for the program, Wendell Evans, testified that Whitelock may have been given tougher assignments because he was doing better work and progressing faster than the other trainees.
 
 
 7
 The next set of incidents involved the quality of supervision and evaluation of the trainees provided by their several supervisors, particularly defendant Jean Fraley. Wright adduced evidence that in a variety of ways the supervisors gave less instruction to the black trainees than to Whitelock and that they were more reluctant to take the time to answer questions from the blacks than from Whitelock. Whitelock essentially acknowledged that he received closer supervision, but asserted that this was because he took the initiative to seek this out.
 
 
 8
 Fraley was the supervisor under whom Wright worked when he began rotating through the various branches of the Records Center. The black trainees perceived her to be racially prejudiced and some non-blacks also did. She possessed what was described on trial as an "abrasive" personality and some who testified attributed her behavior to that. The district court found, and this is not controverted on appeal, that Fraley gave closer instruction and supervision to Whitelock while he worked under her than to the black trainees. This, however, was found to be the product of a mistaken belief on Fraley's part that Whitelock was to be permanently assigned to her branch. After the black trainees complained, Fraley was removed from her position.
 
 
 9
 At the end of his first year, Wright was promoted to GS-7 as were the other trainees. Until well into his second year in the training program his evaluations were "good" or "excellent" except for one evaluation of "poor." When he attempted to determine who gave it, he was at first unable to obtain an answer, but eventually learned it was Fraley. He then sought and was successful in having Fraley's superior, Walter Barbash, raise it to a "fair." During the latter period of his second year in the program, Wright's evaluations began to fall off. The evidence as to cause is in sharp conflict. Wright contends that it resulted from a stiffening of the evaluation criteria at that time. Another explanation, of which the record contains only a suggestion, is that during the earlier stages of the program someone was assisting Wright in preparing his reports and that when that stopped his deficiencies appeared. No specific findings of fact as to this matter were made.
 
 
 10
 The ultimate focus of Wright's claim of discrimination relates to unequal special training opportunities provided the three black trainees as opposed to those provided Whitelock. In addition to rotation through the various branches of the Records Center, the trainees were provided with a number of courses to provide special training. To some extent these seem to have been tailored to the perceived needs of each trainee. Wright, who had writing problems, asked for and was assigned a composition course in the graduate school of the Department of Agriculture. Whitelock attended courses in "Work Force Estimating" and "Work Simplification Techniques." From this, it is contended that Whitelock attended courses that were better adapted to training managerial skills.
 
 
 11
 The main contention of discriminatory unequal training however pertains to a so-called Special Projects Staff created in May 1971 to serve the Washington National Records Center. Twice recommended in the late 1960's, its principal function was envisioned to be that of dealing with management problems arising throughout the Records Center. Originally the plans had called for a staff of nine, but due to economic concerns, Joseph Bradt, then Manager of the Center and a defendant in this action, asked only for a chief and six staff members. Only the chief and three staff positions were created; and the defendant Roy Wilson was assigned as Chief of the Staff. Bradt, Wilson and Walter Stender, Assistant Archivist for Federal Records Centers, were charged with selection of the original staff. The three people selected were a recent graduate of another special training program, a recent graduate of the program in which Wright was a participant, and Orace Whitelock. All three were white.
 
 
 12
 The stated basis for Whitelock's selection was that the Special Projects Staff, whose implementation had been delayed several years, had a number of projects of a pressing nature which would require immediate attention. Due to the small staff, supervision would have to be minimal. Whitelock had performed better than the other trainees, was a superior writer and could work with less supervision. In selecting Whitelock for the position, Bradt did not consider rotating all of the trainees through the Special Projects Staff. However, as events developed, each of the black trainees, including Wright, rotated through the Staff as trainees for one month each and in late 1971 or early 1972, they were regularly assigned to the Staff under circumstances that will later be described.
 
 
 13
 The length of time that Whitelock served on the Special Projects Staff when the black trainees did not is the subject of dispute. Wright contends it was six or seven months; defendants claim it was closer to three. Whitelock, according to his own quarterly reports, was appointed to the staff on May 3, 1971 and he immediately assumed his duties there. The exact date upon which the black trainees were formally assigned to the Staff is not clear, but Wright began his tasks there on December 23, 1971 and Nolan and Sistare seem to have taken up their duties with Special Projects at about the same time. In addition it is conceded that Wright spent one month on rotational assignment to Special Projects between May and December, but the record does not indicate when. It is of course obvious that, whatever the exact time, Whitelock had the experience provided by this assignment for an appreciably longer portion of the two-year training program than did Wright and the other trainees.
 
 
 14
 In the fall of 1971, the defendant Forest Williams replaced Bradt as the Manager of the Washington Records Center. He had a number of misgivings about the way in which the training program was being conducted and about the use of the program as an affirmative action project. He felt that the trainees were spending too much time on operations-oriented projects as opposed to tasks that were more managerial-oriented. When the trainees were not on rotation they tended to slip back into performing the duties they had performed before being assigned to the training program. He believed that the evaluations of the trainees had been overly generous and that the second year, and particularly the last six months, of the program should be more demanding than the preceding portions. He also expressed doubts about the viability of any program where everyone passed.
 
 
 15
 A related concern of Williams' was that the training program was a poor vehicle for affirmative action. He testified that he had had qualms about it before becoming Center Manager, but that his belief had not crystalized until he gained some first-hand knowledge. By selecting underskilled applicants, without diminishing the standards of performance demanded by the program, he believed the Agency might have disserved the blacks selected.
 
 
 16
 Williams undertook a number of steps to improve the training program after he became Manager. He insisted that evaluations be more rigorous and that the trainees be assigned tasks that better prepared them for managerial positions. In late 1971 or early 1972 he assigned the black trainees to the Special Projects Staff and stated before trial that there were no money problems that precluded appointing anyone to that program. At trial, when the conflict between that statement and Bradt's explanation for why only Whitelock had been appointed originally was brought to his attention, Williams clarified his position by stating that the money problems had been relieved by certain economic moves that had been taken in the summer and fall of 1971. When the blacks were assigned to Special Projects, a black supervisor, Edith Thomas, was also assigned there. The amount of supervision provided the black trainees was allegedly still minimal, but Nolan testified that it was more than they had been receiving previously. It is undisputed, indeed stipulated, that Whitelock's training while he alone was on Special Projects Staff was superior to that being received at the same time by the black trainees, including Wright.
 
 
 17
 On March 1, 1972, Nolan dropped out of the program. The exact reason for this is not clear. He had discipline problems and was not performing well, and this is the presumable explanation. This left Wright, Sistare, and Whitelock.
 
 
 18
 On March 22, 1972, an evaluation panel met to consider whether Wright should be passed through the program. The five members were Forest Williams, Roy Wilson, Edith Thomas, Wendell Evans (the Manpower representative for the program), and Patricia Moore (the career development officer for the program). Three were blacks: Thomas, Evans and Moore; two were under the supervision of panelist Williams; Wilson and Thomas; all but Moore had supervised Wright during his training. During that meeting Wright was asked what he felt he needed to work on to become a successful manager. He replied "nothing." The panel disbanded without making a recommendation.
 
 
 19
 The panel reconvened on March 27. Before that meeting Williams, Evans and Walter Stender, Assistant Archivist for Federal Records Center, had met privately and decided that Wright should be offered a ninety-day extension of the training program. The panel accepted that proposal unanimously, being of the opinion that Wright had failed to meet the minimum standards of accomplishment required for graduation. The offer was made to Wright.
 
 
 20
 A dispute exists with respect to what was said when Williams offered the extension to Wright. Wright claims Williams said the odds were ninety out of a hundred that he would not be promoted after that time. Williams attributes that statement to Wright and claims he replied that the odds were fifty-fifty. It is uncontroverted that Williams took the occasion to reiterate his belief that use of the training program as an affirmative action vehicle might be working a disservice to the minority participants. Wright declined to accept the extension. Apparently the offer was then made a second time and refused once more.
 
 
 21
 Williams then dropped Wright from the training program. At the objection of Moore, the panel was reconvened and voted three-to-two in favor of Williams' unilateral action. The three votes were cast by Williams, Wilson and Thomas. Evans felt the panel should have made the initial decision whether to drop Wright, but has stated that he would have voted to drop him. Moore also believed the panel should have made the decision, but she would have voted to promote Wright.
 
 
 22
 Other than Moore, only Walter Barbash among the supervisors who testified felt that Wright was qualified for promotion to GS-9. Even Barbash testified that Wright's competency decreased as the problem he was working on called for more managerial skills. He further testified that the aim of the training program was not to produce graduates who would dead-end at GS-9. Rather the goal was to produce managers who could eventually function at levels from GS-12 to GS-14.
 
 
 23
 In mid-April, Sistare and Whitelock were promoted to GS-9 and permanently assigned to Special Projects. Sistare received special help from Wilson in completing his final project. The training program was then disbanded. Wright continued his employment in the Washington Records Center, and instituted these legal proceedings.
 
 II
 A.
 
 24
 It is necessary at the outset to identify the particular actions claimed by Wright to be discriminatory and to clarify the appropriate mode of legal analysis to be applied in assessing the claims. During the course of the litigation there may have been some confusion and shifting of positions as to each, a circumstance quite understandable in view of the evolving state of controlling doctrine during this protracted litigation. See Nashville Gas Co. v. Satty, 434 U.S. 136, 148, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) (Powell, J., concurring).
 
 
 25
 In his complaint Wright identified both the ultimate failure to recommend him for completion of the program with consequent promotion and various aspects and incidents of the training program itself as the discriminatory actions upon which his claims were based.[4] The district court addressed both of these and found no discrimination either in the conduct of the training program or in the terminal denial of promotion. On this appeal Wright has focused essentially on allegedly discriminatory aspects of the training program, apparently conceding that if the failure to certify his completion of the program with consequent promotion were viewed in isolation he could not sustain a claim of racial discrimination in that specific action. Be that as it may, we have considered it appropriate to review the district court's treatment of both sets of actions.
 
 
 26
 There has also been some confusion as to whether the claims are properly to be analyzed under the "disparate treatment" test of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or under the "disparate impact" test of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), or under both. The district court employed primarily a disparate treatment analysis of the proof, but its oral opinion can fairly be read as having also considered the proof, albeit summarily, under a disparate impact analysis, finding the claims not established under either. On appeal the parties have eventually joined issue under both modes of analysis, and it is on this basis that we review the district court judgment. If any doubt has existed about the appropriate way to assess Title VII claims that seek to invoke both "disparate treatment" and "disparate impact" theories as alternative grounds for relief, Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), decided during the pendency of this appeal, has made it clear through the mode of analysis employed in that case that these are rightly treated simply as alternative theories upon which a right to relief under Title VII may be established in a given case.[5] As such, in keeping with general rules of civil procedure, they may properly be pleaded, Fed.R.Civ.P. 8(e)(2), and if sufficiently supported by evidence, Fed.R.Civ.P. 41(b), analyzed by the trier of fact as alternative grounds of relief. Obviously, as alternative theories and not separate claims they may not be applied to establish multiple violations on the same facts, but short of this no procedural election between them is required of a claimant at either pre-trial, trial, or appellate stages.[6]
 
 
 27
 On this basis, we analyze the claims, as did the district court, under both theories, looking essentially to the contrasting definitions of the two given in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). There, disparate treatment is said to define a situation where "(t)he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." Id. at 335 n.15, 97 S.Ct. at 1854. On the other hand a disparate impact situation is defined as one that "involve(s) employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Id.
 
 
 28
 We take the disparate impact analysis first.[7]
 
 B.
 
 29
 As indicated, the district court considered and rejected in summary fashion the possibility that Wright had established a right to relief under a disparate impact theory.[8] We agree. Central to proof of a Prima facie case under this theory is proof of an employment policy or practice which, though facially neutral or even benign in actual purpose, nevertheless imposes a substantially disproportionate burden upon a claimant's protected group as compared to a favored group within the total set of persons to whom it is applied.[9] Nashville Gas Co. v. Satty, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); Griggs v. Duke Power Co., 401 U.S. at 430-32, 91 S.Ct. 849. Wright would have us find such a policy or practice and such a disparate impact here in various "actions which were supposed to be facially neutral but which resulted in the black trainees' (Sic ) receiving inferior and unequal training and thus had a 'disparate impact' on the black trainees." Reply Brief at 13. Only by a tortured logic that would completely wrench "policy or practice" and "disproportionate impact" from their common and acquired legal meanings in the employment discrimination context could any policy or practice causing disparate impact be found here. The set of persons affected by the personnel actions in question was four in number; of the set of four, three were members of claimant's protected minority group; and of these three, only one is alleged finally to have suffered any legally cognizable harm from the actions charged to be discriminatory.[10]
 
 
 30
 Within this setting Wright's legal claim, advanced solely on his behalf and not that of any other black trainee, thus comes to the proposition that the training program as administered did not equip him, a black, but did equip Whitelock, a white, for the promotion in grade that was the goal of both and the purpose of the program. If this is to be found a violation of Title VII under disparate impact doctrine, the "policy or practice" must be found in the several discrete decisions that ordered the sum total of the training received by these two, and a "disparate impact" in the different results finally experienced by just these two. This simply cannot be done except by warping the doctrine beyond recognition.
 
 
 31
 The policy or practice contemplated by disparate impact doctrine consists of "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," having reference instead to an employer's " standard operating procedure the regular rather than the unusual practice." International Brotherhood of Teamsters v. United States, 431 U.S. at 336, 97 S.Ct. at 1855 (defining "pattern or practice" in Government action under § 707(a) of Title VII). Though the dividing line between a series of "isolated acts" and "standard operating procedure" will obviously sometimes be hard to draw, we think that on any fair and common sense appraisal the actions complained of here must be characterized as the former and not the latter.
 
 
 32
 While we quite agree that an individual may, in appropriate circumstances establish without elaborate statistical proof a disparate impact Prima facie case, See Mitchell v. Board of Trustees, 599 F.2d 582, 585 n.7 (4th Cir. 1979), we cannot agree that the doctrine can fairly be applied to a situation such as that one here where the total set of affected persons is so small, the protected group is numerically dominant in the total set, and the adverse "impact" is finally experienced by only one of the numerically dominant protected group.
 
 
 33
 Disparate impact doctrine as first laid down in Griggs was clearly designed to ensure more perfect realization of the beneficent purposes of Title VII by making plain that discriminatory consequences as well as discriminatory intent fell under the ban of this remedial legislation, and by providing a relatively easy burden of Prima facie proof of discriminatory consequences to overcome difficulties that might normally obtain in proving "discrimination in employment" Vel non. As even a cursory survey of employment discrimination cases since Griggs will easily show, it has been a mighty instrument in correcting the more subtle and sometimes unconscious forms of discrimination that have pervaded employment as tragic legacies from our history. For this reason, it should not be applied by courts with a rigidity or inflexibility that effectively undercuts its intended function of fairly implementing Congressional purpose to root out these more subtle forms. By the same token, its integrity as a rational judicial construct to accomplish those purposes should not be compromised by undisciplined extensions that finally rob it of elemental predictability as an ordering principle for counseling, for voluntary corrective action by employers, and ultimately for litigation. In the long haul, such a warping of principle will not serve the Congressional purposes. To find a policy or practice giving rise to disparate impact on the facts of this case would be just such an undisciplined extension,[11] and we decline to make it. We conclude instead that the evidence fails to establish a Prima facie case of violation under the disparate impact theory,[12] and turn now to the question whether violation may have been established under a disparate treatment analysis.
 
 C.
 
 34
 The framework for analysis of Wright's claim under a disparate treatment theory is that originally laid down in McDonnell Douglas, and subsequently refined and clarified in the course of applications in Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), and Board of Trustees v. Sweeney, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam), as adapted to the particular facts of the instant case. As the Teamsters Court pointed out in distinguishing this theory from the disparate impact theory, it finds violation where an "employer simply treats some people less favorably than others because of race"; which means that "(p)roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." 431 U.S. at 335 n. 15, 97 S.Ct. at 1854. These cases establish a practical scheme of proof for addressing the critical issue of intentional racial or other impermissible discrimination in the treatment accorded a claimant. In its first stage, a claimant has "the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.' " Furnco Construction Corp. v. Waters, 438 U.S. at 576, 98 S.Ct. at 2949. If the claimant meets this production burden, a legal inference of discriminatory motive for the action is created that suffices to carry the claimant's initial burden of production. This shifts to the employer the burden of production, of "going forward"[13] with evidence of "some legitimate, nondiscriminatory reason for the (action)." Id. at 578, 98 S.Ct. at 2950. This, if successfully done, will "dispel" the original adverse inference and entitle the employer to judgment unless in the final stage the claimant can carry the burden of proving "that the proffered justification is merely a pretext for discrimination." Id. In this scheme, employing the familiar device of the presumption to establish a claimant's Prima facie case,[14] the burden of persuasion of violation, including that on the critical issue of discriminatory motive, remains throughout upon the claimant. We conclude that the district court faithfully and accurately followed this proof scheme in analyzing the evidence and finding no violation.
 
 
 35
 As indicated in Part II.A. Supra, Wright's claim of violation as originally pleaded identified both the terminal failure to promote and the antecedent failures to provide equal training opportunities as the discriminatory actions upon which his claim was based. The unequal training incidents relied upon consisted essentially of Whitelock's being given better supervision and aid by all the supervisors, particularly Fraley; Whitelock's being given more challenging assignments and better special training opportunities; and, most critically, Whitelock's being given substantially more training experience with the Special Projects Staff than were Wright and the other black trainees. On the evidence adduced, analyzed within the proof scheme above outlined, we agree with the district court: (1) that a Prima facie case was not established in respect of the terminal failure to promote, viewed as a discrete act of alleged discrimination; (2) that if a Prima facie case was established in respect of the training incidents, viewed either separately or in total effect, it was effectively dispelled as to each by the "articulation of legitimate nondiscriminatory reasons" which in turn were not overcome by proof that they were merely "pretexts" for racial discrimination.
 
 
 36
 The McDonnell Douglas formula for proof of a Prima facie case, as adapted to failure to promote, would require proof (1) that Wright belonged to a racial minority; (2) that he sought and was qualified for promotion to a position to which promotions were being offered to persons of his qualifications by his employer; (3) that despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained available by promotion to others of his qualifications. The evidence clearly supported a finding that Wright was not qualified for the terminal promotion denied him. All five of the evaluators, three of whom were black, agreed in assessing Wright's work that he was not qualified. The district court was entitled to accept this judgment as the basis of its own determination of nonqualification in the absence of any evidence drawing its essential integrity in question.
 
 
 37
 As indicated earlier in this opinion, Wright has on this appeal essentially conceded the validity of this particular finding and has concentrated his argument here on the proposition that the unequal training given him in relation to that given Whitelock was the effective cause of his lack of qualification for promotion, and that being racially motivated, this constituted illegal discrimination.
 
 
 38
 At the outset, we think there is a serious question whether the evidence established a Prima facie case in respect of the training opportunities allegedly denied. The McDonnell Douglas test for establishment of a Prima facie case must certainly be adaptable to claims of unequal training opportunities,[15] See Long v. Ford Motor Co., 496 F.2d 500, 505 & n. 11 (6th Cir. 1974), but this presents some difficulty where, as here, the training program is confined to a small group and is designed to qualify its participants for responsible managerial positions. Presumably all must necessarily be found "qualified" for the training program in general by virtue of their initial acceptance into it; but this cannot be thought necessarily to establish the qualification of each for every discrete assignment and special training opportunity that may be available from time to time within the program's course. So to hold would in effect force all such training programs into a rigid lock-step configuration that could not take into account different incoming strengths and weaknesses, or differing rates of progress within a program. Particularly where the training program is inspired by affirmative action considerations, this could actually operate to thwart its goals. Be that as it may, even if Wright's proof of his general qualification for the training program were deemed presumptively sufficient to round out proof of his Prima facie case, he could not prevail on the total evidence, because of failures at later stages of the proof scheme.
 
 
 39
 As to each of the specific training opportunities given Whitelock and denied Wright, we agree with the district court that the defendants came forward with a legitimate nondiscriminatory reason that sufficed to dispel the adverse inference of discrimination generated by proof of the Prima facie case. As to the admittedly superior supervision given Whitelock by the several supervisors, particularly Fraley, Whitelock's own testimony that he more assiduously sought out supervisory assistance, and Fraley's that she assumed Whitelock was to be in her department following the training program[16] stand as sufficient nondiscriminatory reasons, whatever they may say about the overall quality of the program's design and administration. As to the more challenging assignments and special training opportunities given Whitelock, the simple explanation advanced by defendants that they gave those assignments and opportunities for which the several trainees' incoming abilities and progress equipped them at the time similarly provide a nondiscriminatory reason sufficient in the proof scheme to dispel the inferential proof of discriminatory motive. To deny to such an explanation even that tentative legal significance in a disparate training claim case would be simply to force all training programs having any minority group participants into a rigid pattern unadaptable to special needs and strengths of any of the participants. This cannot be thought commanded by Title VII.
 
 
 40
 The most critical denied opportunity as perceived and argued by Wright on this appeal was that to receive the benefit of work on the Special Projects Staff for as long a period as did Whitelock. Again, the explanation offered by defendants for Whitelock's earlier assignment, though more detailed, is essentially a simple one; and it too suffices as a legitimate nondiscriminatory reason at this stage of the proof scheme. In effect it was that for budgetary reasons only one of the members of this trainee class could be assigned at the time; that the assignment was made not merely to serve training purposes but to meet substantive needs of a hard pressed staff; and that of the three trainees then in the program, Whitelock was substantially better qualified to do the required work with the minimum of supervision that would be available. Again, whatever this may reveal about the lack of wisdom and perhaps sensitivity from a managerial standpoint of risking practically inevitable misunderstanding by providing special training opportunities to some but not all persons in such a program, it clearly passes muster as a nondiscriminatory reason not pretextual on its face.
 
 
 41
 We agree with the district court's assessment that with respect to all the charged acts of discrimination, the defendants had come forward with sufficient evidence of nondiscriminatory reasons to dispel the Prima facie showing. At this stage, consideration therefore properly turned for the district court, and turns for this court in review, to the question whether the evidence considered as a whole established that the nondiscriminatory reasons advanced were in fact mere pretexts for racially discriminatory treatment. On this the burden of persuasion was upon the claimant. We conclude with the district court that the evidence does not show the reasons to have been pretextual, and that accordingly Wright's claim was not established.
 
 
 42
 At this stage, a claimant's required proof of discriminatory motive has in effect been narrowed and focused upon the specific reasons advanced by the employer. The claimant need now only attack these, but the underlying requirement remains to prove that the real as opposed to now specifically "articulated" reasons was a racially inspired intent to treat less favorably. On this issue, the evidence, both that of the claimant and the employer, may take a variety of forms, but since the issue is fundamentally one of a state of mind, the available evidence will typically, as here, be wholly circumstantial. See McDonnell Douglas Corp. v. Green, 411 U.S. at 804-05, 97 S.Ct. 324. Of obvious importance is any evidence that tends to indicate the employer's general conduct, hence likely motivation, in related treatment of the claimant and comparably situated members of the claimant's protected group. See Furnco Construction Corp. v. Waters, 438 U.S. at 580, 98 S.Ct. 2943; McDonnell Douglas Corp. v. Green, 411 U.S. at 804-05, 97 S.Ct. 324. In the instant case, aside from the evidence offered of Fraley's possibly specific racial bias,[17] the evidence of the defendants' general conduct in respect of Wright and other black trainees in the program tended overwhelmingly to establish a generally preferential rather than invidiously discriminatory attitude on the defendants' part. That it was characterized by a considerable amount of fumbling, and was perhaps fundamentally misguided in relation to its affirmative action goals in many respects,[18] cannot dispel this. The district court rightly pointed to this evidence as critical on the issue. We summarize it here. At the very outset, entrance requirements were lowered to encourage admission of blacks to the program. Thereafter blacks were actively recruited while whites were not. When the black trainees objected to the attitude of the defendant Fraley, Fraley was removed. When seating patterns caused concern, they were changed to meet the black trainees' objections. When the black trainees objected to Whitelock's assignment to the Special Projects Staff they were assigned to it, albeit later.[19] Of the two black trainees who remained in the program to its stated end one, Sistare, was promoted despite an initial evaluation that he was not qualified, while the other, claimant here, was offered an extension of training in order to see if he might later qualify.[20] There is simply no countervailing evidence that tends to show any general racial bias at work against Wright and the other black trainees in this program. In the absence of more direct evidence of impermissible motivation for the specific acts charged, the circumstantial evidence of general attitude clearly fails to establish defendants' stated reasons as pretextual. Indeed it tends to corroborate their nondiscriminatory motivation.
 
 
 43
 Perhaps in recognition of the force of this evidence of general motivation, Wright seems to argue here that defendants' articulated reasons are shown to be pretextual simply by the fact that they do not indicate a purpose in each instance specifically to maximize Wright's opportunities in relation to Whitelock's. Thus, it is apparently suggested that with the ability to assign only one trainee to the Special Projects Staff, defendants' only permissible, I. e., nonpretextual, basis for decision was deliberately to favor a black trainee over the sole white trainee without regard to any other considerations. However that may commend itself as a basis for action on principles other than the legal one we enforce, and however legally defensible it might be if done voluntarily, Cf. United Steelworkers of America v. Weber, ---U.S. ----, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), it clearly is not commanded by Title VII. A similar contention with respect to proof adequate to overcome articulated reasons for hiring decisions was advanced and specifically rejected in Furnco. See 438 U.S. at 576-78, 98 S.Ct. 2943. In doing so the Furnco Court pointed out that "Title VII prohibits . . . having as a goal a work force selected by any proscribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees." Id. at 577-78, 98 S.Ct. at 2950. Transposing that principle to the training program decisions involved here, Title VII forbade making those decisions on a proscribed discriminatory basis; but it did not require making them solely on the basis of favoring a minority employee without regard to other considerations. To apply the disparate treatment proof scheme in this case as claimant would have us do would therefore be to impose upon employers a burden not imposed by Title VII. This we may not do. We conclude with the district judge that on the evidence presented, no violation of Title VII was established.
 
 III
 
 44
 In conclusion, it may be in order to step back from the necessarily technical discussion of "disparate impact" and "disparate treatment" legal doctrine to take a broader view of the issues and their resolution. The underlying grievance here plainly grew out of a positively motivated intention to better the employment conditions of minority employees. In the event, however, an affirmative action training program whose Bona fides in creation has never been challenged went sour. The result was frustration and distress for all parties and eventually charges of racial discrimination in the administration of a program designed in major part to rectify past discrimination.
 
 
 45
 There are hard lessons to be learned. Any affirmative action effort worth its salt must involve some risks for employers as well as employees. These risks must obviously be made reasonably tolerable for both if the efforts are to be continued with determination by both. Too high risks for employees in the form of unrealistic expectations can be expected to yield just the sort of frustration and antagonisms that occurred here. Ultimately this must result in chilling the willingness of minority employees to embark upon the risks at all. Employers have a clear moral and prudential obligation not to make those risks too high. At some point this obligation assumes legal proportions. The risks cannot be such that they constitute "built-in headwinds" for a protected group in relation to others so that the consequences are a provable "disparate impact" upon the former, or such that specific incidents of disparate treatment necessarily result from their imposition.
 
 
 46
 On the other hand, too high risks for employers in the form of legal requirements that all such programs undertaken must in effect be made to "work" for all members of the protected group can be expected to chill the zeal of employers voluntarily to undertake truly significant efforts.
 
 
 47
 Within controlling legal principles we have concluded that the risks inherent in the training program here could not fairly be said to have resulted in a "disparate impact" upon the protected group of which the individual claimant was a member, and that the various specific ways in which they were experienced by him could not be found racially motivated, hence to have involved "disparate treatment." This is not to say that they may not have been most improvidently imposed. But improvidence, and even insensitivity, are not, standing alone, violations of Title VII. In the final analysis, as we have considered the evidence presented here, there is no way that Wright's legal claim could be found established except by wrenching controlling principle to impose upon the employer an obligation to make this perhaps ill-conceived undertaking work for Wright. Such a rule given general application would impose so high a risk upon employers that their impulse to undertake any but the most innocuous and limited affirmative action efforts would inevitably be chilled. Such a consequence could not serve the fundamental purposes of Title VII.
 
 
 48
 AFFIRMED.
 
 
 49
 BUTZNER, Circuit Judge, with whom WINTER, Circuit Judge, joins, dissenting:
 
 
 50
 James B. Wright's claim of disparate treatment in an equal opportunity training program at the National Archives Record Center illustrates the racial discrimination frequently encountered in federal employment at the beginning of this decade. The legislative history of the Equal Employment Opportunity Act of 1972[1] discloses that despite constitutional, statutory and executive prohibitions against discriminatory employment practices in the federal establishment, minorities continued to be denied equal employment opportunities. Wright's GS-6 position placed him among the eighty percent of the government's minority employees who were found in grades 1 through 8. This disproportionately low representation of minorities in grades 9 and above, among other factors, led Congress to the conclusion that the government had failed "to pursue its policy of equal opportunity."[2]
 
 
 51
 The situation at the Record Center reflected the general conditions described by Congress. A manager of the Center, appointed in late 1971, described its racial climate as "unhealthy." In 1969 an investigation of the Center corroborated his assessment. The summary of the lengthy investigative report stated:
 
 
 52
 Although we found no evidence of overt acts of discrimination currently being practiced, we do conclude that there have been subtle actions by management that present a clear pattern of discrimination. These past acts have effectively prevented any Negro from becoming eligible for positions of Branch Chief or above. The career ladder has been denied the potentially qualified as well as the qualified Negro. The term "qualified" is used here as it applies to the white counterpart who is now at the Branch chief level and above.
 
 
 53
 Reference Branch Management is 100% White. The Branch chief, GS-13, and the two Section chiefs, GS-12, contend that there are more Negro supervisors at the stack level (67%) than whites. While this is true, it should be pointed out that although 78% Of the branch employees are Negroes, only one has a grade higher than GS-7 and he is not a supervisor. To gain a full understanding of the discriminatory practices the past history of the Records Center, formerly Region 3, must be studied. To the Negro employee there has been no apparent attempt to alter the "plantation system" that existed in Alexandria. Negro employees feel that it will continue to exist as long as the present management personnel has control, and that a Negro will be kept at a certain level regardless of expertise or qualifications.
 
 
 54
 To remedy such discrimination, Congress enacted the Equal Employment Opportunity Act of 1972, which included among its requirements nondiscriminatory training programs.[3] Even before Congress acted, the President prohibited discrimination on the basis of race in every aspect of employment including the "development (and) advancement . . . of civilian employees," and he ordered the head of each executive agency to "provide the maximum feasible opportunity to employees to enhance their skills . . . ."[4]
 
 
 55
 This case, now nearly 10 years old, must be viewed in the factual and legal setting of the time. It discloses that Wright's treatment was not an isolated incident of federal employment and that his superiors had the affirmative duty to rectify all discrimination in his training.
 
 
 56
 * The district court summarized its reasons for entering judgment against Wright as follows:
 
 
 57
 It is clear that the plaintiff was not qualified to pass the program at the time of its scheduled ending, and plaintiff, having rejected the proffered extension which might have improved his qualifications, has not satisfied steps two and three of the model outlined in McDonnell Douglas, and has not established a prima facie case of discrimination.[5]
 
 
 58
 The majority opinion of this court holds that the evidence supported the district court's finding that Wright was not qualified for promotion at the termination of his training program, and it approved the district court's method of analyzing the case.
 
 
 59
 With deference, we suggest that the district court's analysis of the case reveals a fundamental error of law. Judgment in a disparate treatment case involving an allegedly discriminatory training program should depend on whether the employee was denied equal training. Its outcome should not turn on whether the employee failed to pass the course. See Morita v. Southern California Permanente Medical Group, 541 F.2d 217, 219 (9th Cir. 1976) (dictum); Long v. Ford Motor Co., 496 F.2d 500, 505-06 (6th Cir. 1974) (dictum).[6] The gist of Wright's complaint is his allegation of discriminatory training. For the purpose of this dissent, we will assume that Wright was not qualified to pass the course,[7] but his failure does not determine the outcome of this case. The critical issue is whether he was denied equal training because of his race.
 
 
 60
 The principles expressed in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), and Board of Trustees v. Sweeney, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), explain the proper method for evaluating the evidence in this case. Because those cases did not involve training programs, the discrete elements of proof they mentioned are inappropriate here, but their underlying principles are applicable. See McDonnell Douglas, 411 U.S. at 802 n. 13, 93 S.Ct. 1817; Furnco, 438 U.S. at 575, 98 S.Ct. 2943; Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1976). These principles, modified to accommodate training programs, suggest the following criteria for evaluating the evidence: To establish a prima facie case of racial discrimination in a training program the plaintiff must show (1) that he belongs to a racial minority; (2) that he was qualified to enter the training program; (3) that the training he received was inferior to that afforded his white counterparts; and (4) that he failed to pass the course.
 
 
 61
 If the employee proves his prima facie case, his employer must articulate some legitimate, nondiscriminatory reason for the disparity in training. In this event, the ultimate burden of persuasion rests on the employee to prove that the proffered explanation for the disparity is a pretext for discrimination.
 
 
 62
 At no stage of the proceedings need the employee assume the additional burden of showing that despite unequal training he was qualified to pass the course; nor need he assume the nearly insurmountable task of showing that but for the discriminatory training he would have passed. This is because Congress has recognized that a racially discriminatory training program is in itself an unlawful employment practice.[8] Proof of discriminatory motive is essential, and it sometimes can be established by inference, or, as in any other civil action involving motive, by circumstantial as well as direct evidence. Teamsters, 431 U.S. at 335 n. 15, 97 S.Ct. 1843; McDonnell Douglas, 411 U.S. at 804-05, 93 S.Ct. 1817.
 
 II
 
 63
 Wright has satisfied requirements one and four of the analysis explained in Part I. He is a member of a racial minority, and he failed the course. Also, there can be no doubt that he was qualified to enter the program. Wright had been employed by the Center since 1957. He had been promoted to the grade of GS-6 and had received a cash award and a letter of appreciation. His superiors had an opportunity to become familiar with his capabilities, and they had access to his personnel file. They deemed him qualified.
 
 
 64
 The government emphasizes that he was not a college graduate,[9] but it introduced no evidence that a college degree was a valid prerequisite for participation. It did not even introduce evidence that employees who presently held the grade of GS-9, to which the trainees aspired, were college graduates.[10] Moreover, Nolan, a black trainee who had a college degree, did not receive any training that significantly differed from that accorded Wright and Sistare, the two black participants who lacked degrees. Certainly, Nolan, because of his college degree, was not afforded the same quality of instruction given the white trainee with a degree. A college degree may well have been the type of barrier to equal opportunity which the legislative history of the Equal Employment Opportunity Act of 1972 described in these terms: "Civil Service selection and promotion requirements are replete with artificial selection and promotion requirements that place a premium on 'paper' credentials which frequently prove of questionable value as a means of predicting actual job performance."[11]
 
 
 65
 Based on Wright's record of government employment, his selection for the training program by his superiors, and the absence of any finding by the district court that he was not qualified to enter the program, we believe that he was qualified and that he has satisfied requirement two of the analysis in Part I for proof of a prima facie case.
 
 
 66
 The critical issue of Wright's prima facie case is whether he satisfied requirement three by proving that the training he received was inferior to his white classmate's. For the purpose of this dissent, we will discuss only three of Wright's several allegations of disparate training.
 
 
 67
 First incident of disparate training. At the inception of the training course, Wright was retained at his current job for three months.[12] He testified that he did not get any management training from his immediate supervisor and that he worked primarily on his own performing his regular duties. The government did not introduce any contradictory evidence. In contrast, Wright's white classmate was immediately given management training. The white trainee's personnel file does not indicate that he was ever assigned to the tasks Wright continued to perform during the first three months. Thus, Wright's nominal participation in the program during the first three months of the two-year course did not afford him management training equal to his white classmate's.
 
 
 68
 Second incident. For approximately three months, the same supervisor was in charge of the trainees at the Disposal Section of the Center. Wright described this phase of the training program as follows:
 
 
 69
 Q How did (this supervisor) treat the different trainees?
 
 
 70
 A Well, the white trainee was . . . and (the supervisor) treated him very well. She gave him what I thought was an ample amount of guidance in his work, and she showed him how to proceed, and in what manner; just gave him a lot of guidance.
 
 
 71
 However, the black trainees, she didn't give any guidance to. She treated them with a very abrasive manner. When you approached her, she was very reluctant to give it; most of the times, it wasn't in sufficient depth, and subsequently the black trainees made errors, and she would make a great thing about it.
 
 
 72
 The government did not call the supervisor as a witness and this evidence remained uncontradicted. Indeed, the district court implicitly found that she gave closer instruction and supervision to the white trainee than she gave to the three black trainees.
 
 
 73
 Third incident. The white trainee received superior training on the Special Projects Staff. There is a conflict in the evidence over the time this inequality existed. Wright claims it lasted seven months, the government contends it was only three or four months. The district court made no finding to resolve this dispute, and for the purpose of this dissent, we will accept the government's position. There is, however, no question about the disparity in training. The parties stipulated that "(the white trainee) received better management training and experience than (the black trainees) while he was on the Special Projects Staff and they were not."
 
 
 74
 This disparity was not immaterial, for a section chief at the Center stated: "I believe the assignment of the white trainees to the Special Projects Staff represents a very significant difference in treatment between the white and black trainees." Moreover, even after Wright and his black classmates were assigned to the Special Projects Staff, they were not afforded all of the opportunities for training that the white trainee had received.[13]
 
 
 75
 Wright has established by uncontradicted evidence that in three specific instances, his training was inferior to the instruction afforded his white classmate. This proof satisfies the third requirement of the analysis in Part I of this dissent.
 
 
 76
 Satisfaction of step three completes Wright's compliance with all four requirements of the analysis. Therefore, we conclude that Wright proved a prima facie case of racial discrimination in the training program.
 
 III
 
 77
 The analysis set forth in Part I next requires consideration of the government's response to Wright's prima facie case of racial discrimination and the burden of ultimate persuasion resting on Wright. These issues are governed by the Board of Trustees v. Sweeney, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), where the Court said:In Furnco Construction Corp. v. Waters . . . we stated that "(t)o dispel the adverse inference from a prima facie showing under McDonnell Douglas, the employer need only 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " (citation omitted) We stated in McDonnell Douglas, supra, that the plaintiff "must . . . be afforded a fair opportunity to show that (the employer's) stated reason for (the plaintiff's) rejection was in fact pretext."
 
 
 78
 For clarity, we will discuss the three incidents of disparate training in the same order that we dealt with them in Part II.
 
 
 79
 First incident. The government articulated no reason for the disparate training during the first three months of the program.
 
 
 80
 Second incident. The government advanced three reasons for the disparate training provided by the supervisor in the Disposal Section. It says that the supervisor had an "abrasive personality." But abrasion is not a legitimate nondiscriminatory reason for denying black trainees an equal opportunity with a white trainee, especially when the record discloses, as here, that the abrasion ground only the black trainees and was not applied to the white. Under these circumstances, it is a manifestation of overt discrimination.
 
 
 81
 The government also says that the supervisor's favoritism for the white trainee resulted from her belief that he would be assigned permanently to her section upon his completion of the course. This, we submit, is not a legitimate, nondiscriminatory reason for disparate treatment in a training program. It explains a cause of the disparity, but it affords no justification for slighting the instruction of the black trainees which they needed to successfully complete the course.
 
 
 82
 The government adds that in any event, the supervisor was removed as an instructor soon after the black trainees complained about her. This, of course, explains only how the disparity was terminated. It does not provide a legitimate nondiscriminatory reason for the disparity that existed for the three months before she was removed.
 
 
 83
 Third incident. In explanation of the disparity of training in the Special Projects Staff, the government said that the Center lacked funds to assign all of the trainees to the Special Projects Staff, that the white trainee was better qualified than the black trainees, and that the assignment was made, not simply for training, but also to serve the pressing needs of the Staff.
 
 
 84
 These explanations will not withstand scrutiny. Although the government's claim of insufficient funds is tortured,[14] the district judge credited it, and for the purpose of this dissent we will accept his finding. Even so, the lack of funds does not explain why the white trainee was afforded better management training than the black trainees received after they were belatedly assigned to the Special Projects Staff. No insufficiency of funds caused this disparate treatment. Furthermore, the government has never explained why lack of funds prevented an equitable rotation to the Staff of all trainees, black and white alike.
 
 
 85
 The government's explanation that the white trainee was selected in preference to Wright and the other black trainees because of his superior qualifications twice defies congressional policy that all persons, regardless of race, should be afforded equal training. The initial wrong was the inferior training Wright received, in comparison with the white trainee, for approximately six months at the inception of the program and during the time he was instructed in the Disposal Section. The government's explanation compounds the initial wrong by judging the relative qualifications of Wright and the white trainee for assignment to the staff after this extended period of unequal training. Disparate treatment in the final stages of an equal opportunity training program cannot be justified by reliance on the superior qualifications of a white trainee when the record establishes that the black trainee had previously received inferior instruction. Since the government's explanation rests on a faulty premise, it cannot be accepted as a legitimate, nondiscriminatory reason for the stipulated disparity in training.
 
 
 86
 The government's third explanation is also irrational. If the Special Projects Staff was hard pressed to complete its work, it readily could have been augmented by assigning the black trainees to it. The government never contended that the black trainees were not qualified to work on the Staff. It asserted only that the white trainee was better qualified.
 
 
 87
 The government also insists that Wright should not prevail because he was offered a 90-day extension of training, and it suggests that by rejecting the extension he became the author of the harm that befell him when he was denied promotion.
 
 
 88
 In the first place, Wright was offered no assurance that he would be promoted at the completion of the 90-day extension. At the most, he was told that he had only a 50-50 chance of passing.[15] Thus, it cannot be said with certainty that Wright was denied promotion because he did not accept the extension.
 
 
 89
 More importantly, the gist of Wright's complaint was the denial of equal instruction because of his race. By the time the extension was offered, he had already received between nine and ten months of instruction inferior to that of his white classmate for which the government has articulated no legitimate nondiscriminatory explanation. He was not told what course of instruction he would receive during the extension, and the government never disclosed how a three-month extension would rectify the deficiencies in his instruction that occurred in the past. The three-month extension might have signalled the end of some of Wright's disparate treatment, but it could not erase the discrimination to which he had previously been subjected, which is, of course, the gist of his complaint.[16]
 
 
 90
 Moreover, the offer of the extension cannot be viewed apart from the reasons the Center's officials passed Sistare. The day after Wright rejected the extension, the officials met to discuss Sistare. With reference to this meeting, the parties stipulated:
 
 
 91
 One conclusion of this meeting was that Mr. Sistare should be promoted. Even though none of the black trainees was entirely satisfactory, it was recognized that failing all three black trainees could be detrimental and not in the best interest of the Service's Equal Employment Opportunity Program. Therefore, it was decided that the trainee they thought was the best of the three, Mr. Sistare, would pass in spite of some perceived deficiencies.
 
 
 92
 This evidence, refutes the suggestion that Sistare's promotion dispels Wright's claim of racial discrimination. Moreover, the attitude of the officials, which the stipulation discloses, coupled with the documented report of subtle racial discrimination at the Center and the antipathy of a high official toward including the black participants in the training program, leaves one with the impression that the offer of the extension to Wright and the subsequent advancement of Sistare were calculated to demonstrate compliance with EEOC regulations and not to enhance the skills of the black trainees.
 
 
 93
 This impression is at least partly supported by the administrative record. At the conclusion of the administrative hearing, the examiner observed that the original concept of the training program was "admirable and valid," but that during the first 18 months of the two-year course, it was a "rudderless entity" and that during that time its implementation was "almost 'pro forma' ." During this period he found that it "lacked coordination, direction, affirmative leadership, and an evaluation plan that would measure progress against stated goals."[17]
 
 
 94
 It was during these 18 months, which comprised seventy-five percent of the time allotted to the program, that the most egregious discrimination against Wright occurred.
 
 
 95
 Although he ruled against Wright,[18] the examiner stated that "(he was) left with the question as to why a trainee progressed to within sight of his completion date of the training only to learn his progress was less than satisfactory and would require an additional 90 days to determine whether or not he could be certified as having successfully completed the program." Like the administrative hearing, the de novo trial offered no answer to this critical question.
 
 
 96
 To recapitulate, in accordance with the analysis in Part I for evaluating the evidence in a disparate treatment case involving training, Wright clearly proved his charges of racial discrimination during the first three months of the program and the three months he was instructed by the supervisor of the Disposal Section. The government's articulation of reasons for the concededly disparate training pertaining to the Special Projects Staff does not in our opinion satisfy the requirements of McDonnell Douglas, Furnco, and Sweeney that such articulation must be legitimate and nondiscriminatory. Even if the government's reasons should be accepted as facially sufficient, we would hold that Wright has carried his ultimate burden of persuasion by proof that the government's proffered justification was a pretext for the subtle discrimination that existed at the Center in 1969 and continued through the first quarter of 1972.[19] It is evident that the Center's training program was simply a pro forma exercise for nominal compliance with the requirements of an Executive Order and EEOC regulations without the attribute of equality that is essential to such a project.
 
 IV
 
 97
 Since we would reverse the judgment of the district court and remand this case for further proceedings, we will discuss briefly the relief to which Wright is entitled.[20] The Supreme Court has instructed district courts in Title VII cases to fashion the most complete relief possible and to exercise their duty "to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." See Teamsters v. United States, 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977).
 
 
 98
 Wright seeks an injunctive order proscribing racial discrimination, requiring certification of his completion of the training program, and his promotion to grade GS-9 with assignment to duties appropriate to this grade; back pay; such other relief as the court deems equitable; costs and attorneys' fees.
 
 
 99
 In our opinion, Wright is not entitled to immediate certification of completion of the course and promotion to grade GS-9. The purpose of an equal opportunity training program is to enable employees to achieve the skills necessary for advancement. Its purpose is not to advance those who have not acquired these skills. Cf. Griggs v. Duke Power Co., 401 U.S. 424, 430-31, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).
 
 
 100
 We would hold, however, that Wright is entitled to the additional training that is reasonably necessary to enable him to satisfactorily complete the Archives Specialist Training Program. On remand, the district court should determine the length of the training period, taking into consideration the experience and skills Wright has acquired during the intervening years while this case was pending.
 
 
 101
 Also, we would direct the district court on remand to provide that Wright's work in the training program should not be evaluated by standards more strict than those imposed on the 1969 class that consisted entirely of white trainees. It is undisputed that towards the end of Wright's training the requirements for passing the course were substantially increased, partially, it appears, because it was an equal opportunity program. The record indicates that during 1970 and part of 1971, both the 1969 white class and Wright's class were trained simultaneously under the same program. The white 1969 class, however, was allowed to graduate in the spring of 1971 under evaluations less strict than those applied to Wright in the latter part of 1971 and 1972.[21] The government offered no evidence that any member of the white classes of previous years was inadequately trained or unqualified to do the work commensurate with a GS-9 position. In the absence of this evidence, the government has presented no justification for treating Wright unequally in comparison with the members of the 1969 white class who were graduated from the course and promoted before the standards for completion of the course were made more rigorous.[22]
 
 
 102
 If Wright were to complete the course satisfactorily, he should be promoted to grade GS-9, assigned work commensurate with his grade, and awarded back pay in an amount equivalent to the difference between his present grade and grade GS-9 from April 19, 1972, the date he was failed because of an unsatisfactory evaluation that followed nine to ten months of racially discriminatory training. In Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-22, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court explained that an award of back pay is appropriate to vindicate the dual policies of Title VII to make employees economically whole for the injuries of past discrimination and to spur employers to eliminate discriminatory practices. Section 2000e-16(b) of Title 42 specifically allows back pay awards against the federal government, and nothing in the Act or its legislative history makes the principles governing an award against private industry inapplicable to the federal government.
 
 
 103
 We would also rule that Wright is entitled to an injunction prohibiting the defendants and their successors in office from discriminating against him on the grounds of race with respect to the terms and conditions of employment. He should be awarded costs and a reasonable attorney's fee for services in the district court and here both in the prior[23] and present proceedings.
 
 
 
 [1]
 The complaint also alleged violations of rights secured by 42 U.S.C. § 1981 and the Fifth Amendment. Plaintiff has not assigned error in respect of the denial of these claims, and we therefore do not address them. Though the action was commenced as a class action, it was converted to an individual action by amended complaint
 
 
 [2]
 Earlier, the district court had disposed of this action by affirming through summary judgment an agency administrative denial of Wright's claims of discrimination, confining itself to review of the administrative record. Wright v. National Archives & Records Serv., 388 F.Supp. 1205 (D.Md.1975). On appeal, this Court vacated the district court judgment and remanded the case for trial De novo. See Chandler v. Roudebush, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976)
 
 
 [3]
 This appeal was originally heard on April 5, 1978 by a panel of the Court. Before any panel opinion was filed, rehearing en banc was ordered
 
 
 [4]
 45. Plaintiff alleges that the defendants individually and in their official capacities have discriminated on the basis of race in violation of plaintiff's rights under 42 U.S.C. § 2000e-16, under 42 U.S.C. § 1981, and under the Due Process Clause of the Fifth Amendment, by:
 (a) Refusing to recommend plaintiff for completion of the Archives Specialist Training Program and withdrawing him from the program solely because of his race, and not because he was not qualified, which he was;
 (b) Giving plaintiff and the other black trainees in the program supervision and training which was inferior to that given white trainees;
 (c) Giving plaintiff and the other black trainees supervision and training which was inadequate to allow them to perform the tasks assigned as they were expected to perform them;
 (d) Assigning plaintiff and other black trainees to programs and duties which were for the most part nonmanagerial in nature while whites were assigned to programs that were managerial in nature;
 (e) Assigning programs and duties on the basis of criteria such as college education which were not related to the successful performance of the programs or duties or to the successful completion of the Archives Specialist Training Program and which discriminated against plaintiff and the other black trainees;
 (f) Changing the standards for successful completion of the program after plaintiff and the other black trainees had entered so that it was more difficult for them to complete the program than white trainees.
 
 
 [5]
 Furnco did not authoritatively address this as a matter needing resolution; it simply illustrated the process in the course of decision. The point had already been made. International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). We address it here only because of the possibility noted in text that there may have been confusion on it in the course of this litigation
 
 
 [6]
 Of course, as in civil litigation generally, a decision may frequently be made by the trial court that only one theory is supportable on the evidence, either in response to motion for dismissal, or in the course of making findings and conclusions following bench trial. More rarely, it may be made on the pleadings or on motion for summary judgment. Thereafter, unless corrected on appeal, the case has effectively become only a "disparate impact" or "disparate treatment" case, but this is not by forced party "election."
 
 
 [7]
 This may be the better order for courts in any case where both theories are advanced. A claimant's path after establishment of a Prima facie case is considerably easier under the impact theory than under the treatment theory, and the same probably holds true for relative ease of proof analysis by courts. Economy of judicial effort thus suggests this order of analysis
 
 
 [8]
 The court's articulated consideration of the theory consisted essentially of recognition of the Griggs test which was summarized, followed by a characterization of Wright's claim, then followed by a summary finding that the claim failed, in which is implicit a conclusion that it did not meet the Griggs test
 
 
 [9]
 While a disparate impact Prima facie case may also be established by statistical proof simply of gross underrepresentation of a protected group in an employment set without identifying any particular policy or practice as its cause, E. g., Hazelwood School Dist. v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), this is obviously not such a case
 
 
 [10]
 Wright cites cases, Morita v. Southern Cal. Permanente Medical Group, 541 F.2d 217 (9th Cir. 1976); Long v. Ford Motor Co., 496 F.2d 500 (6th Cir. 1974); Newman v. Avco Corp., 7 F.E.P. Cas. 385 (M.D.Tenn.1973), for the several propositions: that disparate impact theory may be invoked in relation to training programs; that it may be invoked by individual as well as class actions; and that the violative practice may be shown to rest on subjective as well as objective criteria. We have no disagreement with the validity of these as general principles, though we observe in passing that only in Newman were they applied to find a discriminatory practice. Our disagreement is with the contention that they should be applied in a case such as the instant one where the challenged employment practice consists of so limited a number of discrete episodes, the set within which disparateness of impact is to be found is so small in total number, and where only one of that set is claimed to have experienced a legally cognizable adverse impact. None of the cited cases shared these critical characteristics with the instant case in even approximate measure
 
 
 [11]
 In technical effect the result would be to find a disparate impact Prima facie case established in any situation where a single white male employee has received an employment benefit hiring, promotion, etc. not received by a comparably situated member of a protected group. This would cast upon the employer defendant the difficult business necessity defense rather than requiring of defendant the mere "articulation of a legitimate nondiscriminatory reason" that could only be overcome by claimant's counterproof of pretext. See Part II.C. Infra. Disparate impact theory would thereby effectively have swallowed disparate treatment theory as available modes of establishing a Title VII violation
 
 
 [12]
 We therefore do not reach Wright's argument that defendants' evidence failed to establish the business necessity defense required to overcome a Prima facie case of disparate impact
 
 
 [13]
 The nature of this burden, whether one merely of production or one of persuasion, See generally, McCormick's Handbook of the Law of Evidence § 336 (2d ed. E. Cleary 1972), may have been in some doubt until quite recently. McDonnell Douglas originally described it in terms of "articulating" a nondiscriminatory reason. 411 U.S. at 802, 93 S.Ct. 1817. This characterization, clearly implying merely a production burden, was repeated in Furnco, but there the court also spoke of the burden as one of "proof" of the reason, suggesting a persuasion burden. 438 U.S. at 578, 98 S.Ct. 2943. In Board of Trustees v. Sweeney, 99 S.Ct. at 295, however, the Court held that the burden was merely one of "articulation," of production, and that it did not require "proof." It is on this basis that we describe the burden in text in the traditional language of production burdens: the burden of "going forward." Of course, whether a mere production burden has been met can raise a serious question of law. The evidence produced must pass judicial scrutiny as presenting a "legitimate, nondiscriminatory reason." If as a matter of law it does not, there would be presented a question of proof that we have no need to address on this appeal. See note 14, Infra
 
 
 [14]
 Because we conclude that here the presumption, or inference, was effectively dispelled by the employer's evidence of nondiscriminatory reasons, we are not presented the question of its effect if not so "dispelled": whether to compel or merely to permit a finding for the claimant
 
 
 [15]
 McDonnell Douglas is not confined to hiring but is to be applied, flexibly adapted, to any claim of disparate treatment. 411 U.S. at 802 n. 13, 93 S.Ct. 1817; See International Bhd. of Teamsters v. United States, 431 U.S. at 358, 97 S.Ct. 324
 
 
 [16]
 The Fraley incident, even if claimant's version be accepted, simply could not, standing alone, be thought to involve a violation of Title VII. Significant harm in relation to claimant's employment could not fairly be ascribed to it. It was quickly remedied by Fraley's removal from the supervisory position when the black trainees complained about it. We include it in the discussion only because Wright argues it as part of a pattern
 FN$$aFN17. See note 16 and accompanying text Supra.
 
 
 [18]
 A possibility candidly conceded by the defendant Williams who succeeded Bradt as manager of the Records Center. One of the most significant factual aspects of the case is precisely the openness with which Williams recognized and acted to correct what he perceived to be initial errors in judgment in drawing the black trainees into the program as designed. Certainly with respect to Williams' actions, this clearly bespoke a nondiscriminatory motive
 
 
 [19]
 Wright attacks as pretextual the defendants' assignment of budgetary constraints as the reason for initially assigning only Whitelock to the Special Projects Staff. Specifically he points to the fact that Williams was able once he took over in the Fall of 1971, to assign all the trainees to the Staff. Williams however explained that constraints that obtained in July 1971 when Whitelock alone was assigned had by October 1971 when all were assigned been removed by effecting in the interval some economies of operations. This was not directly challenged, and in view of Williams' obvious efforts to compensate for what he perceived to be difficulties confronting the black trainees, it is not inherently suspect. Certainly the original decision of the budget unit cannot be considered discriminatory, since it did not specify which, if any, of the trainees in the 1970 class was to be assigned
 
 
 [20]
 Presumably as bearing upon the pretextual nature of defendants' general conduct towards him, Wright suggests that this proffered extension of time was itself a sham. He testified that in offering the extension to him Williams opined that the chances against eventual promotion were 90-10. Williams directly contradicted this, saying that it was Wright who offered this pessimistic estimate of his chances, and that he, Williams, gave a much more hopeful one of 50-50. The fact that Williams twice sought to induce Wright to take advantage of the additional training, and requested the evaluating panel to allow it seems to belie any such estimate as that ascribed to Williams by Wright. In any event Wright's stated reason for declining it at the time was not that it would be futile, but that it was unnecessary because he was already qualified. The district court did not make any specific findings in respect of this essentially peripheral fact, but implicit within its general finding that defendants' actions in relation to Wright were not pretextual in nature is a finding to that effect in respect of this particular matter. Certainly on the conflicting evidence before the court, such a finding is not subject to rejection in review. Fed.R.Civ.P. 52(a)
 
 
 [1]
 Pub.L.No.92-261, 86 Stat. 103 (1972) (amending Civil Rights Act of 1964, Pub.L.No.88-352, Title VII, 78 Stat. 253)
 
 
 [2]
 H.R.Rep.No.238, 92d Cong., 1st Sess. 22, 23, U.S.Code Cong. & Admin.News 1972, pp. 2137, 2158, Reprinted in Sen. Comm. on Labor and Public Welfare, 92d Cong., 2d Sess., Legislative History of the Equal Employment Opportunity Act of 1972, 61, 82, 83 (Comm. Print 1972)
 
 
 [3]
 42 U.S.C. § 2000e-16(b)
 
 
 [4]
 Exec. Order No. 11,478, 3 C.F.R. 133 (1969), Reprinted in 42 U.S.C. § 2000e note. This Executive Order was in effect when the events giving rise to this case occurred. It was implemented through regulations that required the head of each agency to establish a continuing affirmative program for equal opportunity employment without regard to race. 5 C.F.R. § 713.201 (1971). Training was specifically required as a part of this program. 5 C.F.R. § 713.203(d) (1971)
 
 
 [5]
 The criteria of McDonnell Douglas v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), which the district court applied to this case require the plaintiff to show:
 (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 [6]
 Wright's brief incisively exposes the error in the district court's analysis with the following comment:
 It makes little sense to ask whether the plaintiff was qualified for promotion at the conclusion of the training program, when the thrust of plaintiff Wright's claim was that he had received training inferior to that given his white "classmate" . . . and this inferior training resulted in his being given less opportunity to develop the expertise and experience necessary to pass the program than (the white trainee) received. Under the district court's reasoning, if a white trainee was given extensive training in a training program while a black trainee in the same program was given no training at all, the fact that the white trainee would, necessarily, be more competent to perform the job for which he had been trained at the end of the program would establish an absence of discrimination. If such reasoning were correct, then no person could ever challenge training, . . . as being discriminatory.
 
 
 [7]
 We note, however, that on this question the evidence was in sharp conflict. The career development officer at the Center and another official, who supervised 24 weeks of Wright's training, testified that Wright was qualified for promotion at the end of the course
 
 
 [8]
 42 U.S.C. § 2000e-2(d). The Civil Service Commission regulations implementing 42 U.S.C. § 2000e-16 also require nondiscriminatory training programs. 5 C.F.R. § 713.203(d) (1978). See also note 4, Supra
 
 
 [9]
 There is no evidence that Wright lacked the intelligence to acquire a college degree. On the contrary, the trial transcript discloses that he had taken college courses while working and expected to graduate in June 1977
 
 
 [10]
 Indeed, the record indicates a college degree was not always required for employment at the Center even at the GS-13 level
 
 
 [11]
 H.R.Rep.No.238, 92d Cong., 1st Sess., 24, U.S.Code Cong. & Admin.News 1972, p. 2159, Reprinted in Sen. Comm. on Labor and Public Welfare, 92d Cong., 2d Sess., Legislative History of the Equal Employment Opportunity Act of 1972, 61, 84 (Comm. Print. 1972)
 
 
 [12]
 Wright testified that he was retained for four months. The district court made no finding with respect to this aspect of his participation in the training program, but viewing the evidence in the light most favorable to the prevailing party, we will accept the government's claim of three months
 
 
 [13]
 The white trainee had an opportunity to visit another records center and to receive specialized forms of training and course instruction. The black trainees never received these advantages
 
 
 [14]
 No contemporaneous explanation for the selection of the Special Projects Staff was given to the trainees. During this litigation the government presented conflicting explanations for the initial exclusion of the black trainees from the staff and it did not exhibit the Center's budget
 Because the black trainees were already on the payroll, it is obvious that assigning them to the staff would not have increased the Center's overall budget. The government offered no evidence that the black trainees were indispensible to the Center's other operations while they were excluded from the staff.
 
 
 [15]
 Wright testified that he was told his chances were slim about 90-10. The district court made no finding with reference to this conflict in the evidence, but we will accept the government's version
 
 
 [16]
 As explained Infra, text at note 21, the 90-day extension would not have eliminated the inequality in evaluation of a trainee's capabilities about which Wright complained. See op. of the court, p. 710 n.4 (f)
 
 
 [17]
 The examiner attributed the improvements in the program in the last six months to the appointment of a new manager for the Center in October, 1971, who, heeding the black trainees' complaints, belatedly assigned them to the Special Projects Staff. This official, however, was critical of incorporating the training program into the Center's equal opportunity plan. However sincerely held, his views were contrary to express congressional and presidential policy. See notes 3 and 4, Supra
 
 
 [18]
 The principal error in the examiner's decision was its failure to evaluate the evidence in accordance with McDonnell Douglas, Furnco, and Sweeney. This is quite understandable for, writing in January 1973, the examiner did not have the benefit of these cases. Studied adherence to the precepts of these Supreme Court opinions is essential to the proper resolution of this case
 
 
 [19]
 The Manager of the Center who was responsible for the training program during most of the time Wright participated in it testified that he was not aware of the 1969 report documenting racial discrimination at the Center. He referred to the Center's black employees as "the brothers" in a "derogatory sense."
 
 
 [20]
 Since we believe Wright has proved his case under the "disparate treatment" test of McDonnell Douglas, Furnco, and Sweeney, we find it unnecessary to consider his alternative claim for relief under the "disparate impact" theory of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Both theories are available to an employee who alleges a violation of Title VII. Teamsters v. United States, 431 U.S. 324, 335-36 n.15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)
 
 
 [21]
 The 90-day extension offered Wright would have perpetuated this inequality
 
 
 [22]
 We do not question the government's right to upgrade its training program. If the government offered evidence that previous white trainees were inadequately prepared because of lax standards, Wright would have to satisfy more rigorous standards regardless of his race
 
 
 [23]
 See op. of the court, p. 706, n.2, Supra