Patricia B. ALLEN and Sylvester J. Vaughns, Individually and on behalf of all persons similarly situated, Plaintiffs,

v.

PRINCE GEORGE'S COUNTY, MARYLAND, Defendant.

Civ. No. H-77-1226.

United States District Court, D. Maryland.

May 4, 1982.

834

Jeffrey A. Burt, Richard F. Orr, Marc D. Guren and Arnold & Porter, Washington, D. C., and Charles M. Tobin and Shulman, Rogers, Gandal & Tobin, Silver Spring, Md., for plaintiffs.

Daniel M. Clements, Judith A. Malone and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., and David S. Bliden, Associate County Atty., Upper Marlboro, Md., for defendant.

ALEXANDER HARVEY, II, District Judge:

This suit was filed as a class action by a black female and a black male,[1] who have charged Prince George's County, Maryland (hereinafter "the County")[2] with various racially discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.[3] Plaintiff Patricia B. Allen (who has never been employed by the County) alleges that in 1972 she applied to the County for a position as a secretary but that, in spite of her qualifications, she was thereafter denied employment because of her race. Plaintiff Sylvester J. Vaughns (who has been a County employee since 1970) alleges that because of his race he was in 1975 denied transfer or promotion by the County to a professional-level job. Plaintiffs are here seeking back pay, front pay, injunctive relief, attorneys' fees and costs.

Following preliminary discovery, plaintiffs moved under Rules 23(a) and 23(b)(2),

1. The National Association for the Advancement of Colored People ("the NAACP") was also one of the original plaintiffs. When the NAACP refused to comply with certain discovery requests found to be proper by the Court, an Order was entered dismissing it as a party plaintiff to the action.

2. The County Personnel Officer, the County Personnel Board and members of the Board were also originally named as defendants in the amended complaint. Orders were subsequently entered dismissing these additional defendants from the case.

3. By stipulation, plaintiffs' claims asserted under 42 U.S.C. § 1983 were dismissed early in the proceedings.

F.R.Civ.P., for certification of this suit as a class action, with both plaintiffs serving as the class representatives. The class proposed by plaintiffs would have included all blacks who, at any time since March 24, 1972, were employed or applied unsuccessfully for employment in any position (other than in the so-called "exempt service") in any agency or department of the County government, except the Police and Fire Departments. Following a hearing, this Court, pursuant to Rule 23(c)(1) and Rule 23(c)(4)(B), conditionally certified two separate subclasses, one a subclass of unsuccessful black applicants for County employment to be represented by plaintiff Allen and the other a subclass of present and former black employees to be represented by plaintiff Vaughns. This Court concluded that different factual and legal issues were presented in this case by each of the two plaintiffs which could best be resolved by the conditional certification of two separate subclasses, each represented by a single plaintiff rather than by only one class represented by both plaintiffs. As later modified, the Order conditionally certified the following two subclasses: [4]

(1) *Subclass of Unsuccessful Black Applicants for Employment.* This subclass shall consist of all blacks who unsuccessfully applied for employment with Prince George's County, Maryland, in any position (other than a position in the "exempt service" as defined in Section 902 of the Charter of Prince George's County, Maryland) in any agency or department of the County Government (except the police and fire departments), provided that the subclass shall not include unsuccessful black applicants: (a) who were denied employment solely because of their failure to pass any preemployment test or tests or to meet other minimum qualification requirements administered or imposed by Prince George's County as a condition of employment; (b) whose claims of race discrimination are based in whole or in part on 42 U.S.C. § 2000e, *et*

seq., and whose applications were finally rejected by Prince George's County prior to December 19, 1972; or (c) whose claims of race discrimination are based solely on 42 U.S.C. § 1981, 42 U.S.C. § 1983 or the Fourteenth Amendment to the United States Constitution and whose applications were finally rejected by Prince George's County prior to September 15, 1974. This subclass shall be represented by the named plaintiff Patricia B. Allen.

(2) *Subclass of Black Employees and Former Employees.* This subclass shall consist of all blacks who were, are or have been employed by Prince George's County, Maryland, in any position (other than a position in the "exempt service" as defined in Section 902 of the Charter of Prince George's County, Maryland) in any agency or department of the County Government (except the police and fire departments), on or at any time since March 24, 1972, provided that the subclass shall not include all blacks: (a) whose claims of race discrimination are based in whole or in part on 42 U.S.C. § 2000e, *et seq.*, and whose employment with Prince George's County was finally terminated prior to July 2, 1974, and who have not been employed by Prince George's County at any time since that date; or (b) whose claims of race discrimination are based solely on 42 U.S.C. § 1981, 42 U.S.C. § 1983 or the Fourteenth Amendment to the Constitution of the United States and whose employment with Prince George's County was finally terminated prior to September 15, 1974 and who have not been employed by Prince George's County at any time since that date. This subclass shall be represented by the named plaintiff Sylvester J. Vaughns.

In conditionally certifying these two subclasses, this Court found that each independently met the requirements of Rule 23. However, pursuant to Rule 23(c)(1), the Court ruled that if the evidence at the trial

---

4. Following a dispute concerning the proper interpretation of the Order entered on April 16, 1979 granting in part plaintiffs' motion for class certification, the terms of the original Order were modified by Memorandum and Order entered on August 10, 1981.

established that one or more of the subclasses should be altered, amended or decertified, this would be done before a final decision on the merits. As permitted by Rule 23(c)(4)(B), each subclass has been treated as a separate class.

Following extended discovery proceedings and the entry of a Pretrial Order, the case came on for trial before the Court sitting without a jury. Extensive expert and other testimony was presented by the parties, and numerous exhibits were admitted in evidence. The record here is a massive one. Findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P., are contained in this opinion, whether or not so characterized.

## I

### The contentions

There are four claims presented here by the plaintiffs: (1) the individual claim of plaintiff Allen that she was not hired by the defendant in 1972 or thereafter because of her race; (2) the individual claim of plaintiff Vaughns that because of his race he was in 1975 and thereafter denied transfer or promotion to a professional-level job; (3) the class claim presented by plaintiff Allen that the County has since 1972 engaged in a pattern and practice of discrimination with respect to the hiring of qualified blacks; and (4) the class claim presented by plaintiff Vaughns that the County has since 1972 engaged in a pattern and practice of discrimination with respect to the promotion and transfer of blacks.

In opposing the individual claims, defendant asserts that both individual plaintiffs have not met their burden of establishing a prima facie case as required by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As to the individual claim of plaintiff Vaughns, defendant further contends that it has articulated legitimate, non-discriminatory reasons why Vaughns was not transferred to a comparable job when his Grade 30 position was eliminated in 1975 as a result of a reduction in force.

Defendant further argues that the statistical and other evidence produced is not sufficient to make out a prima facie case in favor of the two subclasses which have been conditionally certified and that, in any event, defendant has successfully rebutted any prima facie case proven by the subclasses. Finally, relying on *Hill v. Western Electric Co., Inc.,* 596 F.2d 99 (4th Cir. 1979), *cert. den.* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979) and *Abron v. Black & Decker, Inc.,* 654 F.2d 951 (4th Cir. 1981), defendant asserts that the Vaughns subclass should be decertified because plaintiff Vaughns is not a proper representative of a class of County employees allegedly denied promotions or lateral transfers because of their race.

## II

### The background facts

Prince George's County, Maryland, the defendant in this case, is the most populous county in the State of Maryland. Before 1971, the County was governed by Commissioners. In January of 1971, a County Charter was adopted, establishing a County Executive and a County Council as the executive and legislative branches of county government. The County Charter required adoption of a merit system with respect to employment practices in the County. Between 1971 and 1977, the County's Personnel Office was operated pursuant to a merit system ordinance. In 1977, a new personnel law was adopted, which was also designed to operate pursuant to merit system principles. For the County to receive federal funds, it was necessary that its merit system be approved by the United States Office of Personnel Management (formerly the Civil Service Commission).

The first County Executive was William Gullett (a Republican), who served from 1971 to 1974. Winfield M. Kelly, Jr. (a Democrat) was the next County Executive, and he served from 1974 to 1978. The present County Executive is Lawrence J. Hogan (a Republican).

In 1972, County Executive Gullett established a Task Force to conduct a survey and make recommendations relating to minority hiring within the County. A report was rendered, as a result of which the County established an Equal Employment Opportunity Office, appointed an Equal Employment Opportunity Officer and adopted an affirmative action plan for the hiring of blacks and other minorities. The original plan was approved in September 1973 and revised in September of 1974. Each year thereafter the plan was further updated.

There are approximately 4,000 positions in the County government, which are allocated among more than 400 classifications or job titles established under the County's classification plan. In 1970, the County had a black population of 13.9%, while by 1980, the black population had increased to 37%. Between December 1974 and October 1981, the number of individuals employed by the County government declined. This was the result of a hiring freeze instituted by County Executive Kelly and continued by the subsequent Republican administration headed by County Executive Hogan. In December of 1978, County voters had adopted an amendment to the County Charter which froze the County's budget at 1979 levels. As a result, the size of the County work force was thereafter reduced. Salaries paid by the County to its employees are generally below comparable salaries paid by neighboring governmental units, including Maryland's Montgomery County, the District of Columbia, Virginia's Fairfax County and the Federal Government.

Procedures for hiring and promotion have generally remained the same since the County adopted a Charter in 1971. The County hires and appoints employees to fill vacancies by means of a centralized personnel system operating under the Office of Personnel and governed by the County's personnel law. Entry level positions are primarily filled by individuals not already employed by the County. Under County law, where there are an adequate number of individuals within the County government who are qualified to fill a vacant position other than at the entry level, the position is considered promotional in nature and exclusively available to individuals already employed by the County. Approximately 50% of the positions announced for 1974 through 1980 were limited exclusively to individuals then employed by the County (so-called "internals"). The other 50% of the positions were open both to internals and to those seeking initial employment by the County (so-called "externals").

The vast majority of County positions are filled competitively. Job announcements for positions to be filled competitively are made through Job Opportunity Bulletins. These bulletins are routinely posted throughout the County and are mailed to several hundred prospective sources of employees, including local colleges, local universities, local high schools and other local county governments, as well as to the District of Columbia government. Pursuant to the County's affirmative action plans, efforts have been made since 1973 to insure that job announcement bulletins would be forwarded to those colleges and universities which were predominantly black and to civic associations, churches and high schools in predominantly black neighborhoods.

Following the distribution of Job Opportunity Bulletins, applications for employment are accepted. Once received, each application is evaluated by personnel analysts to determine whether the individual applicant meets the minimum qualifications for the job. Individuals possessing minimum qualifications for the job are rated and ranked in the Office of Recruitment and Examinations, and their names are placed on a register of eligibles. The placement of names on the register of eligibles is according to an adjectival rating as to whether the individual is outstanding, well-qualified or qualified. Adjectival ratings are made according to pre-established written standards, which are based upon a review of the knowledge, skills and abilities required for the particular job. From the register of eligibles, the Office of Personnel prepares a certificate of eligibles. The certificate of eligibles is made up of the top five names from the register, if all five of

those individuals have received the same adjectival rating. However, if less than five individuals have a particular adjectival rating, the certificate will include all of the individuals possessing the same but lesser adjectival ratings. For example, if two individuals have been rated outstanding and eleven have been rated well-qualified, the certificate of eligibles will be comprised of thirteen names. If, however, there are seven individuals rated outstanding and five rated qualified, only the five rated outstanding will be placed on the certificate of eligibles.

The certificate of eligibles is then forwarded to the hiring authority for the purpose of selection. The hiring authority is usually the head of the department in which the vacancy exists. Personnel law requires that the hiring authority interview a minimum of five candidates or 5% of the names forwarded on the certificate of eligibles, whichever is greater. In most instances, the hiring authority attempts to interview all of the candidates on the certificate of eligibles. Following the completion of the interviewing process, an applicant is selected and offered the position in question.

Insofar as promotional practices are concerned, County law establishes that internals will be given a preference for the filling of the vacancy, if there are at least six qualified internals. Thus, if a position becomes available and if it is determined that there are six current County employees who qualify for the job, it is offered as a promotional opportunity and applications are received only from individuals currently employed by the County. In most instances, internals apply for higher-ranking jobs within the classification of work that they are currently performing. It is therefore rare that an internal employee is rated as ineligible. By holding a position for an appropriate period of time, an internal is considered eligible for promotion within the same job classification. In selecting internal employees for promotion, department heads have routinely attempted to employ panels of interviewers which include a black member.

When internal employees compete with external applicants, the internal employee is given a preference and his or her name is placed at the top of the list within the particular adjectival group. For example, if nine individuals have been rated well-qualified and two are presently employees, these two would be placed at the top of the list of nine names sent to the hiring authority for interview. No preference or extra credit is given for length of service as a County employee. All internal employees are given the same preference over externals, whether they have been employed by the County for one year or ten years.

After submitting a complaint to the Maryland Commission on Human Relations, plaintiff Allen filed a formal charge of discrimination against the County with the Equal Employment Opportunity Commission (the "EEOC") on October 15, 1973. She alleged racial discrimination against her and against blacks in general with regard to employment opportunities with the County government, commencing on October 5, 1973. Following an investigation, the EEOC on February 10, 1977 found reasonable cause to believe that the County had discriminated against plaintiff Allen and against blacks as a class with regard to hiring. On May 2, 1977, a Notice of Right to Sue was issued by the Department of Justice. This suit was instituted on July 29, 1977.

On April 22, 1975, plaintiff Vaughns filed a complaint with the Equal Employment Opportunity office of the County, with the Prince George's County Human Relations Commission and with the EEOC. On January 6, 1977, the Prince George's County Personnel Board issued a decision concluding that plaintiff Vaughns had not been discriminated against by the County or treated disparately because of his race.[5]

5. Little weight has been given either to the finding of the EEOC concerning plaintiff Allen or the finding of the Prince George's County Personnel Board concerning plaintiff Vaughns. A much more complete record on all the issues

On June 6, 1978, a Notice of Right to Sue was issued.

## III

### *The legal principles applicable to the individual claims*

It is apparent from the pleadings and evidence in this case that, insofar as the individual claims are concerned, the plaintiffs are seeking relief under the "disparate treatment" approach. Disparate treatment is said to define a situation where the employer "simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Wright v. National Archives & Records Service*, 609 F.2d 702, 711 (1979), quoting from *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977). The essence of plaintiffs' individual claims is that in each instance a discrete adverse action was taken by defendant because of the race of each plaintiff. Plaintiff Allen was allegedly not hired because of her race, and plaintiff Vaughns was allegedly not transferred or promoted because of his race.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 668 (1973), the Supreme Court established a three-step procedure for the determination of an employment discrimination case such as this one brought under Title VII of the Civil Rights Act of 1964. As the first step, a plaintiff is required to carry the burden of proving a prima facie case. In *McDonnell Douglas Corp.*, Mr. Justice Powell said the following (411 U.S. at p. 802, 93 S.Ct. at p. 1824):

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position

> remained open and the employer continued to seek applicants from persons of complainant's qualifications.

If the plaintiff satisfies this initial requirement, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action taken.

> The burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the [respondent's] rejection. We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire. Here petitioner has assigned respondent's participation in unlawful conduct against it as the cause for his rejection. We think that this suffices to discharge petitioner's burden of proof at this stage and to meet respondent's prima facie case of discrimination. (411 U.S. at 802–803, 93 S.Ct. at 1824)

These principles were recently reaffirmed in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Decisions of the Supreme Court and of the Fourth Circuit since *McDonnell Douglas Corp.* have made it clear that the burden placed upon the defendant to articulate some legitimate, non-discriminatory reason for its action is not a burden of proof but rather is that of producing an explanation. *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577–78, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978); *Wright v. National Archives & Records Service, supra* at 713–15; *Ambush v. Montgomery County Government Department*, 620 F.2d 1048, 1054 (4th Cir. 1980). The burden of persuasion of a violation does not shift but remains throughout upon the plaintiff. *Wright, supra* at 714.

■ Even if the employer satisfies its burden and meets a plaintiff's prima facie case, that is not the end of the inquiry which a trial court should make, because an

was presented to the Court than was available    to these administrative bodies.

otherwise valid reason advanced by the employer may be used as a pretext for the action taken. The third step of the procedure in question was described by Mr. Justice Powell in *McDonnell Douglas Corp.*, as follows:

> Petitioner's reason for rejection thus suffices to meet the prima facie case, but the inquiry must not end here. While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext.

\* \* \* \* \* \*

> Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks. (411 U.S. at 804–805, 93 S.Ct. at 1825)

In footnote 19 at page 805, Mr. Justice Powell further observed that the trial court may consider the composition of a defendant's labor force as itself reflective of restrictive or exclusionary practices, but cautioned that such general determinations, while helpful, may not be in and of themselves controlling as to "an individualized hiring decision," particularly in the presence of an otherwise justifiable reason for rejection of the employee.

## IV

### The individual claim of plaintiff Allen

Under the *McDonnell Douglas Corp.* test as applied to the facts of this case, plaintiff Allen has initially the burden of establishing (1) that she is a member of a protected group; (2) that she applied to the County in 1972 or thereafter for a secretarial position; (3) that she was qualified for that position; (4) that despite her qualifications, she was not hired; and (5) that at the time her application was pending with the County, there was a position open and the County continued to seek applicants from persons of plaintiff's qualifications. There is no dispute in this case concerning the first, third and fourth elements. Plaintiff Allen is a black woman; she was qualified for a secretarial position with the County; and she was not hired to work as a secretary at any time between April of 1972 and August 1, 1975.[6] It is further conceded that plaintiff Allen did apply for a position with the County in April of 1972. However, defendant contends that she did not thereafter update her application and remain genuinely interested in securing a job with the County between 1972 and 1975. Defendant further contends that plaintiff Allen has not satisfied her burden of showing that a position was open at the time her application was initially filed and that there were thereafter positions available as to which the County continued to seek applicants.

On the record here, this Court finds that plaintiff Allen has not met her burden as to all the requirements for proving a prima facie case of racial discrimination. The bona fides of plaintiff Allen's desire to work for the County are suspect. As a part of her case, she must show a genuine intention to accept employment by the County if offered to her at any time during the period in question. Although plaintiff Allen did initially apply for the position, her actions thereafter do not indicate that she was a person genuinely desiring to work as a secretary for the County.

6. As set forth in Paragraph 7A(1) of the Pretrial Order, plaintiff Allen is here seeking back pay and other benefits only for the period from February 5, 1974 through August 1, 1975. After the latter date, it is conceded that she did not desire to work for the County.

There is no question in this case that plaintiff Allen was fully qualified to do secretarial work for the County. Indeed, her motives are suspect because she was over-qualified for the County job which she purportedly was seeking. A business school graduate with nine years of secretarial experience, plaintiff in 1972 was a legal secretary, working for the large law firm of Arnold & Porter in Washington, D. C. and earning $8,500 a year. This firm represents the plaintiffs in this case. Title VII became applicable to the County on March 24, 1972. Within two weeks, plaintiff Allen had applied for an entry level position with the County.[7] At the time that her application was filed, the County was paying a Clerk-Stenographer I $5,400, or approximately $3,100 less than plaintiff was then earning as a legal secretary for the law firm of Arnold & Porter.

Plaintiff Allen testified that she was willing to take this substantial cut in pay so that she might be employed closer to her home and because she found commuting to Washington to be difficult. Her testimony to this effect will not be accepted by the Court. Plaintiff Allen did not at the time or thereafter apply for any other position within a ten-mile radius of her home.[8] Moreover, she continued to work at Arnold & Porter, and she continued to commute to Washington for two more years after she applied for a County position in 1972. In 1974, she did leave her job at Arnold & Porter and remained unemployed until 1975, receiving $5900 a year as unemployment benefits. This was the same amount that the County was paying an entry level Clerk-Stenographer at the time.

During the period that she was unemployed in 1974, plaintiff Allen did inquire concerning possible employment by the County. Ms Hilda Pemberton, a black County employee in the Personnel Department, wrote to plaintiff Allen, stating that she had been asked to assist the plaintiff in finding a job in the County. By letter dated July 22, 1974, Ms Pemberton advised Ms Allen that she had been unable to contact her by telephone, and requested that Ms Allen call her at her earliest convenience to arrange an appointment. Plaintiff Allen admits that this letter was received. However, she did not call Ms Pemberton thereafter or contact her in any other way to arrange for employment.

In 1975, plaintiff Allen returned to work at Arnold & Porter, at which time she was earning approximately $12,000. In July of 1975, she had filled out a County employment application, indicating that she would not accept any job with the County which paid less than $9,500. At that time, the County was paying clerk-stenographers approximately $6,000 at the entry level. During her testimony, plaintiff Allen recalled that she had been offered an interview in 1975 for a County position which paid $6,000, and she admitted that she had refused to interview for the job because of the low pay. Subsequent to 1975, plaintiff Allen continued to work for Arnold & Porter. Thereafter, she became an employee of the Federal Communications Commission, and in 1981, she was earning some $25,000 annually as an administrative aide.

On the record here, this Court finds that plaintiff has not met her burden of proving that she was a bona fide applicant for a position with the County between 1972 and 1975. When she first applied, there was no opening. Apparently, there were openings at various times during 1972, since the defendant, from its computer records, was able to determine that some twelve individuals were hired by the County as secretaries in 1972.[9] Three of these, or 25%, were

7. Despite a thorough search, her 1972 application for employment could not be found. It is agreed, however, that plaintiff Allen did apply for the position in question.

8. There is no support for her testimony that she applied for positions with several law firms in the County. Had she done so, there should have been documents or other evidence to indicate a serious intention on her part to give up her higher paying job in Washington and go to work for a local attorney near her home in Prince George's County.

9. It is apparent, however, that the County's records in this connection were not complete.

black. However, the evidence indicates that when plaintiff Allen telephoned the Personnel Office on several occasions in 1972, there were no openings. In the written charge she filed with the EEOC, plaintiff Allen did not allege any discriminatory act on defendant's part earlier than October 5, 1973, which was the date of the discriminatory act which caused her to seek relief. In this suit, she is seeking back pay commencing on February 5, 1974.

Before 1974, plaintiff Allen did not renew her application or otherwise update it. The County was therefore justified in concluding between 1972 and 1974 that she was not interested in the job she had initially applied for, particularly since she was earning so much more working as a secretary in Washington. In 1974, when plaintiff Allen did update her application, she was invited by an employee in the County's Personnel Office to call and give further information. Plaintiff Allen did not follow through, presumably because she was receiving as unemployment benefits the same amount that she would have then been paid as a County employee.

In 1975, she filed a formal application, indicating that she would not accept a salary of less than $9,500. Since the County was then paying $6,000, she again did not follow through and interview for the job. The fact that plaintiff Allen did in fact renew her application in both 1974 and 1975 indicates that she realized that some updating of her application was necessary. This did not occur in 1972 and 1973, presumably because she was earning substantially more as a legal secretary with Arnold & Porter.

Since plaintiff has not proved that she was a bona fide applicant for a secretarial position with the County between 1972 and 1975, she has not met her burden of proving a prima facie case of racial discrimination. Accordingly, her individual claim must fail.

V

*The individual claim of plaintiff Vaughns*

Plaintiff Vaughns was employed by the County in 1970, is still so employed and has held several different positions with the County. Plaintiff Vaughns is a high school graduate, and although he has taken several college courses, he never received a college degree. Before he came to work with the County in 1970, he was employed by the Marriott Corporation as a manager of university cafeterias, earning $10,000 a year. In 1970, he was hired by the County at a Grade 30 level, which paid $15,000 a year. The position he then assumed was in the Model Cities Program, and it was normally one which required the applicant to have a Master's Degree.

Between 1970 and 1974, plaintiff Vaughns worked as Executive Director of the Model Cities Action Board, which was a part of the Model Cities Program. In 1974, federal funds were cut, and the entire Program was eliminated. Most of the employees in this Program were black, and when the Program was closed, most of these employees, including plaintiff Vaughns, were laterally transferred to other full-time employment with the County. Plaintiff Vaughns was placed in the position of Administrative Assistant III in the office of the Chief Administrative Officer (the CAO). This was also a Grade 30 level, and plaintiff Vaughns received the same salary as previously.

Several other employees also worked in the County Administrator's office under the CAO. These individuals acted as liaison between various County departments and the County Executive's office.

In December of 1974, Winfield Kelly became County Executive. He decided to eliminate individuals working under the CAO. A Democrat who was succeeding a Republican, County Executive Kelly wanted to appoint personnel of his own selection to work under the CAO. He also decided to cut down on the number of individuals holding those jobs so that he might encourage department heads to have direct access to the County Executive rather than through liaison personnel. Accordingly, in January of 1975, County Executive Kelly informed plaintiff Vaughns and approximately nine other individuals that they would be subject

to a reduction in force (RIF). All of these individuals were advised that the County would attempt to find other suitable employment for them.

Only two of the individuals affected were then in Grade 30 positions, namely plaintiff Vaughns and Mr. Joseph Louis Amico, a white male. Amico was laterally transferred and became head of the County's Drug Abuse and Rehabilitation Program in its Department of Health, retaining a Grade 30 position. After having been unemployed for approximately one week, plaintiff Vaughns was laterally transferred to a lesser job and was employed in the Department of Licenses and Permits as a Housing Inspector, at Grade 27.

Insofar as his individual claim is concerned, plaintiff Vaughns, under the *McDonnell Douglas Corp.* test, has initially the burden of establishing (1) that he is a member of a protected group; (2) that he applied for a transfer or promotion after his job was abolished in 1975; (3) that he was qualified for one of the positions for which he applied; (4) that despite his qualifications, he was not placed in any one of those positions; and (5) that at the time of his rejection, the positions in question remained open and the County continued to seek applicants from persons of his qualifications. As to plaintiff Vaughns' claim, there is no dispute in this case concerning the first and fourth elements. Nor is there any dispute as to the fifth element, insofar as the Grade 30 position filled by Amico is concerned. Plaintiff Vaughns was a black employee of the County in 1975, and he was not transferred to a Grade 30 position following the RIF in the County Administrator's office. Nor was he thereafter promoted from his Grade 27 position to a Grade 30 position. Amico, a white male, did assume a Grade 30 position. Defendant contends, however, that plaintiff Vaughns has not satisfied his burden of proving that he was qualified for any of the Grade 30 positions he was seeking in early 1975, that he was not shown that he ever applied for a promotion from Grade 27 to Grade 30 after he was placed in the former position, and that he has not shown that the Grade 30 positions in ques-

tion remained open while the County continued to seek qualified applicants.

There is no contention made by plaintiff Vaughns in this case that his position under the CAO was eliminated because of his race. No such claim could be made because good and sufficient reasons existed for the new County Executive to eliminate the positions in question in the office of the County Administrator. In essence then, plaintiff Vaughns is here complaining that because of his race he received a demotion following a non-discriminatory RIF. He thus has two claims: (1) that he was not immediately transferred laterally into a Grade 30 position, and (2) that he was not thereafter promoted from the Grade 27 position he received to an available Grade 30 position.

■ On the record here, this Court finds that plaintiff Vaughns has not met his burden of establishing a prima facie case either as to his claim that he was discriminatorily denied a lateral transfer or that he was thereafter discriminatorily denied a promotion. That plaintiff Vaughns wanted to be transferred to another Grade 30 position following the RIF is clear. However, although asked to do so, he did not file a formal application for any of the Grade 30 positions which he claims were then available. The evidence indicates that in February and March of 1975, only one Grade 30 position was then open. That was in the County's Department of Health where there was a position available for a person to be head of the County's Drug Abuse and Rehabilitation Program. The evidence indicates that plaintiff Vaughns was not qualified for that position. Mr. Joseph L. Amico, a white male who had also been in the office of the County Administrator and who had also been subject to the RIF, had previously worked in the County's drug abuse and rehabilitation programs. Plaintiff Vaughns had not. Because of his previous experience in the very field into which he was being transferred, Amico was given the job. Since plaintiff Vaughns has not established that he was qualified for the Grade 30 position to which Amico was transferred

or that any other Grade 30 positions were then open, he has not proven a prima facie case of racial discrimination in connection with the County's failure to laterally transfer him to a comparable job following the RIF in early 1975.

■ In any event, defendant has shown or articulated a legitimate, non-discriminatory reason for the transfer of Amico to the Grade 30 job he received as head of the County's Drug Abuse and Rehabilitation Program. Amico was a former priest who had previously been a teacher of the new County Executive, Winfield Kelly.[10] Since he had previously worked in the drug abuse field and had experience in rehabilitation programs, ample reasons existed for his selection as head of the Program in question.

Plaintiff Vaughns contends that in addition to the Grade 30 position to which Amico was transferred, there were three other Grade 30 positions in the County's Department of Human Resources which were also open and to which he was not transferred because of his race. But the positions in question were not then open. The evidence indicates that during his election campaign, County Executive Kelly had stated that he intended to eliminate this Department. Moreover, when he took office in December of 1974, Mr. Kelly instituted a personnel action freeze in County employment so as to reduce the number of County employees and to hold the line on budget expenses. The evidence in the case does not show that the positions were open at any time before plaintiff Vaughns started his Grade 27 job in March of 1975.[11]

Although he did consult with Ms Lucille M. Johnson, Director of the HRCD Department, and with others, plaintiff Vaughns never submitted an updated application (or even any formal application at all) for the

positions which he claims he was seeking in that Department. In attempting to assist plaintiff Vaughns in securing a suitable position in early 1975, the County's Office of Personnel had reviewed the application which he had submitted in 1974 when he had received a lateral transfer to work under the CAO. After reviewing this 1974 application, two personnel analysts, both of whom were black, concluded that plaintiff Vaughns could not meet the qualifications for the positions he was seeking because the earlier application, which was the only one available, lacked sufficient information. Mr. Jack Folkins, who was the Acting Personnel Officer in January of 1975, concluded on the basis of the information available to him that plaintiff Vaughns was not qualified for any of the Grade 30 positions which were then available. Folkins accordingly asked plaintiff Vaughns to submit a new application which would update the previous information on file and assist the Personnel Office in finding plaintiff a suitable position. Plaintiff Vaughns refused to submit a new application, stating that he intended to sue the County and that he did not want to jeopardize his case by submitting a formal application.

■ As to these three positions in the HRCD Department, this Court finds that plaintiff Vaughns has not proved that these positions were open in February and March of 1975, or that he filed a proper application for the positions, or that he was qualified for the positions. This Court will credit the testimony of the witness Folkins that, based on the information available to the Personnel Office, plaintiff Vaughns was not qualified for any Grade 30 position available in January or February of 1975. In spite of a request that he update his application, plaintiff Vaughns had declined to furnish

10. Amico had also previously been headmaster of a high school in the Washington, D. C. area.

11. Plaintiff Vaughns relies on the fact that Ms. Lucille M. Johnson, Director of the HRCD Department, recommended that he be laterally transferred to the Department as Chief of Program Development. However, the evidence discloses that Ms. Johnson did not have the authority to offer the job to plaintiff Vaughns.

In her memorandum of February 14, 1975 to County Executive Kelly, Ms. Johnson had requested that the freeze be lifted as to the Department so that the position in question might be an active one and plaintiff Vaughns might be laterally transferred to this Grade 30 position. There is no indication that this request was ever granted by the County Executive.

information which would have assisted the Personnel Office in placing him in a suitable position. Like plaintiff Allen, plaintiff Vaughns seemed more interested in litigating his claim than in cooperating with representatives of the Personnel Office in finding an appropriate position for him at a Grade 30 level.

The claim of plaintiff Vaughns that after March of 1975 he was not promoted to a Grade 30 position requires a somewhat different analysis. By letter dated January 29, 1975, County Executive Kelly had formally advised plaintiff Vaughns that he would be separated from his position in the office of the County Administrator at the close of business on February 14, 1975. The letter further stated, "In the meantime, I have asked the Acting Personnel Officer to make every effort to find suitable employment for you elsewhere in the County government. I sincerely hope that these efforts will be successful."

By February 14, 1975, no new position had been found for plaintiff Vaughns. To give him more time, his Grade 30 employment was extended until March 14, 1975, with the hope that he might find another suitable position in the County. On that latter date, plaintiff Vaughns became unemployed. One week later, he was called by Mr. Sam Wynkoop, Deputy County Administrative Office, and was offered a position in the Department of Licenses and Permits as a Housing Inspector, Grade 27. Plaintiff Vaughns accepted that position and was still so employed at the time of the trial of this case.

The evidence indicates that after March 1975, plaintiff Vaughns never applied for a promotion to a Grade 30 or higher position. Nor has he identified any County jobs which he sought after that date, which remained open and as to which the County continued to seek applicants from persons of his qualifications.

Accordingly, this Court concludes that plaintiff Vaughns has not met his burden of proving a prima facie case of racial discrimination either because of the failure of the County to laterally transfer him to a Grade 30 position or because of the failure of the County to promote him to such a position after he had accepted a Grade 27 job. Even were this Court to conclude that a prima facie case had been proved concerning the denial of a transfer in February and March of 1975, defendant has articulated legitimate, non-discriminatory reasons why plaintiff Vaughns did not receive the Grade 30 job given to Amico or the Grade 30 jobs in the Department of Human Resources which plaintiff says he was seeking.

█ Moreover, the credible evidence in this case does not support any finding that defendant's failure to transfer plaintiff Vaughns to a Grade 30 position in February and March of 1975 was based on pretensive or pretextual reasons. Plaintiff Vaughns was not the only employee working in the County Administrator's Office who was subject to the RIF in 1975 and who ultimately was transferred to positions at a lower grade. Three other white employees who were subject to this RIF also received reductions in pay as a result of their transfer to new positions.[12]

Furthermore, as indicated by the opinion of the Supreme Court in *McDonnell Douglas Corp.*, evidence relevant to a showing of pretext includes facts as to an employer's treatment of a Title VII plaintiff during his prior term of employment. 411 U.S. at 805, 93 S.Ct. at 1825. Before the RIF in 1975, plaintiff Vaughns had received very favorable treatment from the defendant. He had been hired to work in the Model Cities Program in 1970 at a Grade 30 level even though he did not have the normal qualifications for the position. In 1974, when the Model Cities Program was terminated because of a lack of federal funds, plaintiff Vaughns and other black employees had been laterally transferred to other full-time positions in the County government. Another Grade 30 job was available for plaintiff Vaughns at that time, and it was given

---

**12.** There were some nine individuals subject to the RIF. Four of them, including plaintiff Vaughns, received reductions in pay when they were transferred to new positions.

to him. Unfortunately, when the RIF in early 1975 occurred, there were no other Grade 30 positions available for which plaintiff Vaughns was qualified. The picture here is hardly that of County representatives advancing pretextual reasons in early 1975 for not transferring plaintiff Vaughns to a job where he would earn as much as he did in the CAO. No evidence has been presented to explain why, if the County were engaged in a pattern and practice of discrimination in these years, plaintiff Vaughns was subjected to racial discrimination in 1975 following the RIF but not so discriminated against in 1974 under similar circumstances when his Model Cities job was abolished.

For these reasons, the individual claim of plaintiff Vaughns must fail.

## VI

### Class action issues

■ Defendant does not challenge the right of plaintiff Allen to represent a class of qualified but unsuccessful black applicants for employment with the County. The evidence supports this Court's conditional certification of such a subclass, and therefore this Court's previous certification will be made final. Moreover, the claims of class members are not mooted or destroyed even though a Court may have found that a class representative's individual claim is without merit. *Brown v. Gaston County Dyeing Machine Company*, 457 F.2d 1377, 1380 (4th Cir. 1972), *cert. denied*, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972). Accordingly, this Court will go on to consider the class claim represented by plaintiff Allen and also the class claim represented by plaintiff Vaughns, even though the Court has found that neither of their individual claims has merit.

Although not challenging the class represented by plaintiff Allen, defendant has moved to decertify the class represented by plaintiff Vaughns. Plaintiff Vaughns was conditionally certified as the class representative for all present and former black employees of the County. The class claim presented is that the County has discrimi-nated against the members of this class with respect to promotions and transfers.

Relying on *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977), defendant contends that plaintiff Vaughns did not possess the same interest and suffer the same injury as did the class members. Since Vaughns never sought a promotion, it is argued that he cannot represent a class of black employees who were denied promotions because of their race. Insofar as the question of a lateral transfer is concerned, it is contended that the numerosity requirement of Rule 23 has not been met since only a few persons were transferred to a lower grade following the RIF in question, and plaintiff Vaughns was the only black.

In support of its motion to decertify, defendant relies on *Hill v. Western Electric Co. Inc.*, 596 F.2d 99, 102 (4th Cir. 1979) and *Abron v. Black & Decker, Inc.*, 654 F.2d 951 (4th Cir. 1981). In *Hill*, the Fourth Circuit held that plaintiffs complaining of racial discrimination suffered by them in assignments and promotions could not represent as class representatives persons denied employment on racial grounds. In *Abron*, the Fourth Circuit held that a plaintiff whose individual claim was based on her discriminatory denial of a temporary transfer to light work for reasons of her health could not represent black employees with reference to hiring, promotion and other employment practices.

In opposing the motion for decertification, plaintiffs rely on the more recent decision of *Brown v. Eckerd Drugs, Inc.*, 663 F.2d 1268 (4th Cir. 1981). In that case, the individual claims of the two black employees were that they had been discharged (or constructively discharged) because of their race. The Fourth Circuit held that the individual plaintiffs could properly represent a class of employees who claimed that the employer had discriminated against them on the basis of their race in connection with promotion and transfer to management and supervisory positions.

This Court has attempted with some difficulty to reconcile the Fourth Circuit opinions in *Hill* and *Abron* with the more recent opinion in *Brown*. This difficulty has been compounded by the fact that in a poll of all the Judges of the United States Court of Appeals for the Fourth Circuit, an evenly divided Court in the *Brown* case voted to deny rehearing *en banc*. *Brown v. Eckerd Drugs, Inc.*, 669 F.2d 913 (4th Cir. 1981). Five Judges of the ten active Judges of the Court voted to grant a rehearing *en banc* in the *Brown* case and the other five Judges voted to deny rehearing *en banc*.

█ Since the *Brown* case is the most recent decision on the subject, this Court will assume (even though *Hill* and *Abron* were not expressly overruled) that the principles there enunciated are controlling. Applying the principles of the *Brown* case here, this Court concludes that plaintiff Vaughns may properly represent a class of black employees claiming that they have been subjected to racial discrimination as to promotions and transfers. In *Brown*, the Fourth Circuit, relying on the earlier case of *Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975), indicated that a broadly constituted class action should be permitted to proceed, even though the class representative did not suffer the type of particularized employment discrimination asserted on behalf of the class.

## VII

### The merits of the class claims[13]

In seeking to prove a prima facie case as to their class claims in this case, plaintiffs have proceeded under both a disparate treatment and a disparate impact theory. Disparate treatment has been defined as a situation where the employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d

396 (1977); *Wright v. National Archives and Records Service, supra* at 711. A disparate impact situation has been defined as one that involves employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another and cannot be justified by business necessity. *Id.*

█ Although proof of a discriminatory motive is a necessary element of a disparate treatment case, statistics may, under appropriate circumstances, establish a prima facie case, even without a showing of specific instances of overt discrimination. *United States v. County of Fairfax, Virginia*, 629 F.2d 932 (4th Cir. 1980), *cert. den.* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). Central to establishing a prima facie case under the disparate impact theory is proof of an employment policy or practice which, though facially neutral or even benign in actual purpose, nevertheless imposes a substantially disproportionate burden upon a claimant's protected group as compared to a favored group within the total set of persons to whom it is applied. *Wright v. National Archives and Records Service, supra* at 711.

Plaintiffs concede that, insofar as their class claims in this case are concerned, they are relying primarily on a theory of disparate impact. At the trial, plaintiffs introduced extensive statistical evidence in support of their claim that defendant utilizes policies and procedures which, although facially neutral, have a statistically significant adverse impact on blacks. In seeking to establish a prima facie case, plaintiffs' evidence included (1) a work force analysis comparing the racial composition of defendant's work force with that in the County's geographic labor market; (2) multiple regression analyses comparing salaries of black employees of defendant with those of non-black employees with comparable qualifications and experience; and (3) applicant

---

13. It has been stipulated by the parties that if plaintiffs are found to be entitled to judgment as to one or both of their class claims, the amount of class damages will be determined in subsequent proceedings.

flow data comparing the success rates of qualified black and non-black applicants for positions with the County. Plaintiffs called Dr. Sheldon E. Haber, an economics professor, to present a static work force analysis. Dr. Charles R. Mann, a private consultant, was called as a statistical expert to present regression analyses. Both of these witnesses discussed the applicant flow data.

On the record here, this Court finds and concludes that the testimony of these two experts and the exhibits which they prepared are not entitled to weight in this case. There are fatal flaws in the approach of both Dr. Haber and Dr. Mann. In preparing his static work force analysis which compared the number of black employees with their presence in the population, Dr. Haber did not exclude those employees hired prior to March 24, 1972, which was the date when Title VII became applicable to Prince George's County. Likewise, Dr. Mann, in preparing his regression analysis, did not exclude persons hired prior to 1972. In *International Brotherhood of Teamsters v. United States, supra,* the Supreme Court observed that a discriminatory pattern which is the result of pre-Act rather than post-Act hiring is beyond the reach of Title VII. 431 U.S. at 360, 97 S.Ct. at 1867. This principle was recently applied by the Fourth Circuit in *Equal Employment Opportunity Commission v. United Virginia Bank,* 615 F.2d 147 (4th Cir. 1980). In that case, the Court said the following, at page 150:

> Thus, in order to be valid, a statistical analysis such as the one presented here must exclude those persons hired prior to July 2, 1965 (the effective date of Title VII for private employers). To include pre-Act hires in the statistical analysis in this case would improperly weight the evidence and would tend to show present discrimination by an employer if it had discriminated prior to the effective date

of the Act but had not discriminated after the Act took effect.

Relying on *United States v. County of Fairfax, Virginia, supra,* plaintiffs contend that, to the extent that defendant has alleged defects in plaintiffs' proof affecting the validity of conclusions drawn therefrom, this is a factual matter to be proved by the defendant in rebuttal. It is argued that the analyses of plaintiffs' two experts should be accepted by the Court because defendant has not introduced evidence to substantiate the deficiencies in question. There is no merit to this contention. In assessing as the trier of fact the weight to be accorded an expert's opinion, this Court is entitled to consider the methodology of the expert and the facts relied upon. Here, it is apparent that, insofar as the issues of this case are concerned, a more accurate picture of the County's work force and of comparable salaries paid to black and to non-black employees will result if the pre-1972 employees are excluded.

Dr. Mann conceded in his testimony that he would have preferred to exclude pre-1972 hires but that he was unable to do so in view of the information supplied to him for preparing his analysis. Dr. Mann did not exclude pre-1972 hires, even though in an earlier case in which he testified the trial court accepted the conclusions of another expert over those of Dr. Mann because the latter's regression analysis failed to exclude pre-Act employment decisions. *See Bostick v. Boorstin,* 22 F.E.P. Cases 719, 724–725 (D.D.C.1978), *aff'd* 617 F.2d 871, *cert. den.,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). The conclusions of Dr. Mann will therefore not be credited.

For similar reasons, this Court will not accept the conclusions reached by Dr. Haber in his work force analysis. Before 1972, there is little doubt that blacks constituted a small percentage of the defendant's work force.[14] Dr. Haber testified that one-third

---

14. The report of the County's 1972 Task Force showed a gross underrepresentation of blacks in almost every department.

of the County's work force in 1980 had been hired prior to 1972. The figures for the years 1972 to 1980 are therefore skewed and unreliable because of the small number of blacks working for the County before it was required by law to comply with Title VII. Before it can properly be determined from statistics whether the County engaged in a pattern and practice of racial discrimination between 1972 and 1981, the racial imbalance existing prior to 1972 should be eliminated from the data.

To rebut the evidence produced by plaintiffs in support of a prima facie case as to their class claims, defendant has introduced statistical data based on an applicant flow analysis. Applicant data has been characterized by the Fourth Circuit as "normally highly relevant evidence" in a case of this sort. *United States v. County of Fairfax, Virginia, supra* at 940. In *Reynolds v. Sheet Metal Workers Local 102*, 498 F.Supp. 952, 965 (D.D.C.1980), aff'd, 25 F.E.P. 837 (D.C.Cir.1981), it was noted that courts and commentators have expressed a preference for actual applicant flow data in Title VII cases.

Dr. Farrell Bloch, a statistical expert, was called to testify for the defendant, and various exhibits prepared by him were introduced in evidence to support his applicant flow analysis. Plaintiffs rely on contradictory testimony of both Dr. Haber and Dr. Mann concerning the applicant flow analysis applicable in this case.

After comparing Dr. Bloch's testimony and the documents prepared by him with those produced on behalf of the plaintiffs, this Court will accept Dr. Bloch's applicant flow analysis over that presented by plaintiffs' experts. Unlike Dr. Haber and Dr. Mann, Dr. Bloch's applicant flow analysis divided the data into two separate categories, separating internals from externals.[15] However, both Dr. Haber and Dr. Mann combined the hiring and the promotion data. The result is a distortion of the statistical information in this particular case in which two separate classes are involved and in which different considerations apply as to hiring and promotions.

Dr. Bloch analyzed the available data by dividing it into EEO categories. The data as to promotions is as follows:[16]

15. Dr. Mann testified that he did not look at each category separately because it would have involved an enormous amount of work. Dr. Bloch apparently performed the extra work necessary.

16. Three sets of data were presented to the experts. Dr. Bloch testified that there was no material difference between the so-called "Data Set 3" and the so-called "Data Set 3 plus 2." Since Data Set 3 plus 2 is more favorable to plaintiffs, it will be the one accepted and discussed in this Opinion.

(Promotions Chart follows)

| DATA SET 3+2 EEO CATEGORY | TOTAL APPLICANTS | BLACK APPLICANTS | % BLACK APPLICANTS | TOTAL PROMOTIONS | BLACK PROMOTIONS | % BLACK PROMOTIONS | PROBABILITY OF CHANCE OCCURRENCE OR STANDARD DEVIATIONS |
|---|---|---|---|---|---|---|---|
| Off/Admin. | 100 | 8 | 8.0 | 23 | 0 | 0 | 11.31% |
| Professional | 207 | 65 | 31.40 | 33 | 6 | 18.18 | −1.78 SD |
| Technician | 142 | 28 | 19.72 | 30 | 5 | 16.67 | −0.47 SD |
| Prot. Serv. | 34 | 7 | 20.59 | 4 | 2 | 50.00 | 97.89% |
| Para-Prof. | 105 | 32 | 30.48 | 21 | 5 | 23.81 | 32.32% |
| Off/Clerical | 378 | 101 | 26.72 | 86 | 21 | 24.42 | −0.55 SD |
| Skilled Craft | 179 | 120 | 67.04 | 50 | 30 | 60.00 | −1.25 SD |
| Serv/Maint. | 10 | 2 | 20.00 | 2 | 1 | 50.00 | 97.78% |

Dr. Bloch used standard deviations where the numbers of individuals in a category were large enough to sustain that test, and he used the Fishers Exact Test for the smaller sample groups. Analyzing this data, Dr. Bloch concluded that there was no discrimination based on race because there was no statistically significant difference between the percentage of blacks applying for promotions and those who received promotions. Dr. Bloch's evidence indicates that blacks constituted 31.72% of all applications for promotions and were promoted in 31.77% of the cases, producing a black promotion rate of 21.1% and a white promotion rate of 21.06%. His conclusion that these results are not statistically significant will be accepted by the Court.

With reference to hiring, Dr. Bloch's data showed the following:

(Hiring Chart follows)

| DATA SET 3+2 EEO CATEGORY | TOTAL APPLICANTS | BLACK APPLICANTS | % BLACK APPLICANTS | TOTAL HIRES | BLACK HIRES | % BLACK HIRES | PROBABILITY OF CHANCE OCCURRENCE OR STANDARD DEVIATIONS |
|---|---|---|---|---|---|---|---|
| Off/Admin. | 215 | 27 | 12.56 | 12 | 2 | 16.67 | 82.09% |
| Professional | 1,010 | 374 | 37.03 | 78 | 28 | 35.90 | −0.22 SD |
| Technician | 401 | 114 | 28.43 | 36 | 4 | 11.11 | −2.41 SD |
| Prot. Serv. | 1,023 | 573 | 56.01 | 103 | 44 | 42.72 | −2.87 SD |
| Para-Prof. | 961 | 448 | 46.62 | 62 | 16 | 25.81 | −3.40 SD |
| Off/Clerical | 2,428 | 919 | 37.85 | 238 | 72 | 30.25 | −2.54 SD |
| Skilled Craft | 274 | 83 | 30.29 | 35 | 11 | 31.43 | 0.16 SD |
| Serv/Maint. | 154 | 85 | 55.19 | 20 | 8 | 40.00 | 11.07% |

In *Castaneda v. Partida*, 430 U.S. 482, 496–97 n.17, 97 S.Ct. 1272, 1281 n.17, 51 L.Ed.2d 498 (1977), the Supreme Court discussed the significance of statistical dispari-

ties in a case such as this one. The Court noted that if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the selection process was random would be suspect to a social scientist. 430 U.S. at 497 n.17, 97 S.Ct. at 1281 n.17. In stating a legal rule of analysis to be derived from *Castaneda*, the Fourth Circuit said that "it can only be that standard deviations greater than two or three necessarily exclude chance as a cause of underrepresentation." *Equal Employment Opportunity Commission v. American National Bank*, 652 F.2d 1176, 1192 (4th Cir. 1981). It was further stated in that case that "courts of law should be extremely cautious in drawing any conclusions from standard deviations in the range of one to three." *Id.*, at 1192.

The hiring data relied upon by Dr. Bloch shows statistical disparities which fall within the *Castaneda* range in four of the eight EEO categories, namely technicians (−2.41), protective services (−2.87), para-professionals (−3.40) and office-clerical (−2.54). These statistical disparities were adequately explained either by Dr. Bloch or by other evidence in the case.

In the protective services category, blacks were 56.1% of the applicants and 42.72% of the hires. Hiring for protective service employees was conducted in only two departments of the County, the Department of Corrections and the Sheriff's Department. The Department of Corrections was created in 1977, and its hiring constituted the bulk of hiring in the protective services category. The original head of the Department of Corrections was Dr. Weldon McPhail, a black, who testified at the trial. He was succeeded in 1979 by Dr. Anton Gaston, also a black. The Sheriff of Prince George's County, Jim Aluisi, a white, also testified at the trial. The testimony of these three individuals established that each of them before 1980 recruited extensively for blacks

to be hired in the protective services category. Applicants with records of prior criminal convictions and with poor work records were eliminated. Both Dr. McPhail and Dr. Gaston testified that for obvious reasons they sought reliable individuals to operate the County Jail. According to Dr. Gaston, more black applicants than white applicants were eliminated from employment because of records of criminal convictions and because of other unfavorable information derived from background checks. According to Dr. Gaston, a vigorous recruitment program such as the one he conducted so as to hire more blacks was more likely to produce applicants with criminal records. Sheriff Aluisi had been elected in 1979. He testified that the growing black community in Prince George's County was a strong political force to which he was keenly responsive as an elected official. As a part of his efforts, he had recruited extensively for black sheriffs. However, he consistently lost black recruits to the Police Department, which paid significantly more than did the Sheriff's Department.

■ Although the statistical disparities in the para-professional and technician categories exceed the two or three standard deviation level, consideration of the number of individuals involved does not indicate to the Court that these are "gross statistical disparities." *See Hazelwood School District v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). As Dr. Bloch testified, a shift of at most eight individuals in the para-professional category from white hires to black hires and a shift of at most three individuals in the technician category from white hires to black hires would result in the elimination of any statistically significant disparity.

Insofar as the office-clerical category is concerned, Dr. Bloch analyzed the figures by dividing this category into two groups, those individuals required to take written tests and those not required to take such tests. For those positions which did not

require any tests, the figures indicated that no statistically significant disparity existed. For those positions where tests were required, the standard deviation increased to −4.20 for those deemed qualified and placed on the register. However, if the number of blacks on the certificate of eligibles is compared to the number of blacks actually appointed, the disparity becomes much smaller. Blacks on the certificate of eligibles were hired at a rate of 10.44% and whites were hired at a rate of 16.07%, creating a disparity of −2.18 standard deviations.

The evidence indicates that for the hiring of office-clerical personnel, the County uses Federal Civil Service Commission tests and tests prepared by the International Personnel Management Association. Indeed, the County has an agreement with the federal government permitting individuals who have passed the County's office-clerical test to be considered for federal office-clerical positions and vice versa. A validation study done by the United States Office of Personnel Management on several different office-clerical tests, including the one used by Prince George's County, determined that office-clerical tests are generally valid for all types of office-clerical positions, and that tests given in one jurisdiction are valid for another jurisdiction.

■ Even if the statistical disparities disclosed by Dr. Bloch's analysis had not been explained by other evidence in the case, the data itself would still not convince the Court that plaintiffs had proven a prima facie case of racial discrimination in hiring and promotions. Isolated bits of statistical information do not make out a prima facie case when divorced from other and contrary statistics and from the statistical picture of all of the employment in question. *Roman v. ESB, Inc.*, 550 F.2d 1343, 1350 (4th Cir. 1976). The statistical information introduced by defendant shows no disparities at all as to promotions in any of the eight categories. It does show four disparities in the eight categories of hiring,

ranging from a standard deviation of −2.54 to one of −3.40. Only one of these disparities is greater than three, namely the paraprofessionals.

■ In assessing the plaintiffs' prima facie case, the Court should consider more than merely the statistical evidence. *EEOC v. American National Bank, supra* at 1189. In particular, the absence of other evidence of discrimination should be considered by the Court in determining whether a prima facie case has been proved. *Roman v. ESB, Inc., supra* at 1350. With more than 1,000 black employees working for the County during the years in question (and many more having applied for County jobs), plaintiffs' case is singularly weak in that it included such a small number of black witnesses who felt that they had been subjected to racial discrimination in connection with either hiring or promotion practices followed by the County. Moreover, the evidence of this sort which was presented, like that presented by plaintiffs Allen and Vaughns themselves, was clearly insubstantial.

Other than that of the plaintiff Allen, the only testimony presented with respect to an adverse individual hiring decision was that of Fred Price, Jr., a black, who testified that he applied for four positions in the County but was not hired. However, he did not know if three of these jobs had ever been filled, and he did not know whether they had been filled by blacks or whites. The fourth job had indeed been filled by a white applicant, but that job went to Larry Hogan, Jr., the son of the County Executive.

With respect to promotions, Leroy Brown was the only black witness who testified for the plaintiffs that he had been denied a promotion. After he applied for the promotion, Mr. Brown was interviewed by a panel of three individuals, Mr. Chen (an Oriental), Mr. Lauer (a white) and Dr. Mann (a black).

Dr. Mann, who later became County Personnel Officer, testified that the panel, after interviewing all the candidates including Mr. Brown and after asking all of them the same questions, had unanimously agreed that Mr. Charles Ross, a white, should receive the promotion.

To be weighed against this lack of evidence of individualized employment decisions of a racially discriminatory nature is the testimony of various black witnesses called by the plaintiffs, who *had* been hired by the County and placed in highly-paid positions. Both plaintiff Vaughns and Mr. Leroy Brown had been initially hired to occupy responsible jobs. Lawyard Wilson, Lucille Johnson and Ray Thomas were also blacks hired by the County into highly-paid positions. Mrs. Johnson had been actively recruited by the County Personnel Office. Although she remembered one incident of hiring discrimination involving a Mr. Harold Jackson, the evidence indicates that the County Personnel Chief intervened with the department head when Mr. Jackson complained and that he was thereafter hired. If racial discrimination was as wide-spread as claimed by the plaintiffs, it might reasonably be expected that more concrete examples of actual discriminatory practices could have been produced in support of the plaintiffs' case.

Relying upon *Patterson v. American Tobacco Co.,* 634 F.2d 744 (4th Cir. 1980), plaintiffs in particular challenge as illegal the County practice, incorporated in County personnel law, which gives preference to internal applicants over externals. Plaintiffs contend that a system of preferences which perpetuates past discrimination and places them at a disadvantage is violative of Title VII. However, the *Patterson* decision was recently reversed by the Supreme Court. *American Tobacco Company v. Pat-*

*terson,* —— U.S. ——, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). The Supreme Court held that under § 703(h) of Title VII, a policy or practice applied pursuant to a bona fide seniority or merit system which is neutral on its face but which may have a discriminatory impact on blacks is not violative of the Act, even though adopted after the effective date of Title VII.

■ In this case, County personnel practices have been applied after 1972 pursuant to a bona fide merit system. For purposes of morale, an employee of the County is given preference over a non-employee when a new position becomes available. In the absence of proof of an actual intent to discriminate, the fact that such a system may have a discriminatory impact on blacks, even though adopted after 1972, is not sufficient to invalidate the system. —— U.S. at ——, 102 S.Ct. at 1536, 71 L.Ed.2d at 751.

■ On the record here, this Court concludes that the credible statistical and other evidence presented does not establish a prima facie case either as to discriminatory hiring or promotion practices in Prince George's County during the years in question.[17] The class plaintiffs have therefore not sustained their burden of proving that the County has engaged in a pattern and practice of racial discrimination with respect to either the hiring of qualified blacks or the promotion and transfer of black employees. A substantially disproportionate burden upon the protected groups represented by these two classes must be shown. *Wright, supra* at 711. Plaintiffs have not here proved that racial discrimination was the County's "standard operating procedure—the regular rather than the unusual practice." *International Brotherhood of*

17. This Court will not credit the testimony of Dr. James Outtz, another expert called by the plaintiffs. Much of what he said was directly contradicted by the testimony of other witnesses in the case. Moreover, Dr. Outtz had been hired by the County to review and improve its system for selecting employees. While continuing to do some work for the County, Dr. Outtz accepted employment by plaintiffs to assist them in this case.

*Teamsters v. United States, supra* at 336, 97 S.Ct. at 1854.

Even if it were to be assumed that the plaintiffs as class representatives had made out a prima facie case under Title VII, this Court finds and concludes that defendant has successfully rebutted that case and has proved that the County did not engage in a pattern and practice of discriminatory employment activities during the years in question. Involved here is a very large County, with an exploding black population during the years between 1972 and 1980. From 1972, the year when Title VII became applicable to the County, until 1980, the black population of Prince George's County increased from 13% to 37%. Quite clearly, blacks were underrepresented as County employees in 1972. During the next eight years, the County has been making a diligent effort to catch up under very trying circumstances.

Beginning in 1973, affirmative action plans for the County have been promulgated.[18] It is apparent that implementation of these plans has not been completely successful and that their goals have not been fully met. However, their lack of success must be attributed to factors beyond the control of County officials. On the one hand, there has been a dramatic increase in the number of black residents of the County. On the other hand, County officials have been met by demands from its citizens for budgetary constraints. Economic freezes have resulted in fewer rather than more available positions for the hiring of qualified blacks. Each of the County Executives who was in office between 1972 and 1980 testified in this case. This Court was impressed by their conscientious dedication to achieving the affirmative action goals which had been established. The evidence produced by defendant establishes that the County has not since 1972 been engaged in a pattern and practice of racial discrimination with respect to the hiring and promotion of blacks.

A large part of plaintiffs' evidence was devoted to criticisms of personnel procedures employed by defendant in the hiring and promotion of its employees. Plaintiffs assert that the County's minimum qualifications have not been properly validated, that the County's rating and ranking system relies on invalid criteria, that the interview process employed is highly selective and that there are other deficiencies in the County's personnel procedures. Plaintiffs further contend that County personnel officials were inadequately trained. But the question before the Court is not whether the County's personnel procedures and affirmative action plans could be more efficiently and effectively administered. The issue is whether the procedures employed have had an adverse impact on the hiring and promotion of blacks. Since the statistical and other evidence produced by the defendant establishes that there was no disparate impact as to these two classes, plaintiffs' criticisms of the County's personnel procedures have little relevance. This is not to say that the affirmative action programs might not have been administered more effectively and might not have produced more black employees or more promotions for blacks. But a lack of efficient administration of programs for the hiring or promotion of minorities would not amount to a violation of Title VII where, as here, the officials involved have been conscientiously and successfully rectifying the racial imbalance which had previously existed among County employees, and where, as here, the proof establishes that there has been no adverse impact on either of the two classes. The post-1972 employment decisions adversely affecting blacks are insufficient in number "to support an ultimate

---

18. Plaintiffs contend that these were mere "paper" plans. The evidence supports no such argument. Although the goals established were not fully met, the plans have been ener-getically implemented and updated by County officials and have since 1972 dramatically increased the representation of blacks in County employment.

conclusion of a Post-Act discriminatory pattern or practice." *EEOC v. American National Bank, supra* at 1188.

Full credit will be given to the testimony of William Gullett, who was an impressive witness. He was the first County Executive and served from 1971 until December of 1974. A member of the NAACP, Mr. Gullett had a political record indicating that since the 1960's he had been firmly committed to furthering the rights of minorities. It was Mr. Gullett who appointed the County's Task Force on Minority Employment and who received its report. It was Mr. Gullett who was County Executive when the first affirmative action plan was prepared in 1973. And it was Mr. Gullett who took steps to implement this first plan during the time that he was in office. In his testimony, he described the difficulties he had encountered in hiring qualified blacks. According to Mr. Gullett, in the Washington metropolitan area, a sufficient number of qualified blacks were simply not available. One of the problems was that the salaries paid by Prince George's County were less for comparable positions than those paid by other governmental employers in the area. Moreover, because of the demand for black employees by both private and governmental employers during the 1970's, a much larger number of black employees resigned to accept higher-paying jobs than did white employees. Although terming the goals established under the County's affirmative action plan "unrealistic," Mr. Gullett testified that he was satisfied with the progress made by the County while he had been County Executive.

County Executives Kelly and Hogan,[19] who followed County Executive Gullett, likewise indicated that they were firmly committed to achieving the goals set forth in the County's affirmative action plans. Unlike the first County Executive, they were faced with the problem of increasing the number of blacks hired during a period when the total number of County employees was declining. County Executive Hogan testified that he nonetheless was successful in terms of percentages. During the first two years of his term, although the total number of County employees decreased by a large number, there was a 10% increase in black employees and a 7% reduction in white employees.

For the reasons stated, this Court concludes that plaintiffs have failed to show a pattern of practice of racial discrimination on the part of the County with respect to either hiring or promotion.[20] Accordingly, the class claims must fail.

## VIII

### *Plaintiffs' § 1981 claim*

42 U.S.C. § 1981 protects persons from racially motivated deprivations of various enumerated rights, including the right to be free from racial discrimination in employment. *See, e.g., Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). Section 1981 requires proof of discriminatory motive and intent. *Robertson v. Maryland State Department of Personnel,* 481 F.Supp. 108, 112 (D.Md.1978), *aff'd per curiam,* 615 F.2d 1357 (4th Cir. 1979). Thus, to be entitled to relief under § 1981, a plaintiff must prove that the deprivation

---

**19.** Mr. Hogan had been a member of the House of Representatives from 1968 to 1974, and had voted in favor of extending Title VII coverage to municipalities.

**20.** The evidence in the case likewise does not show that the County regularly and purposeful-

ly treats or has treated blacks less favorably than whites. *See EEOC v. American National Bank, supra* at 1188. Accordingly, plaintiffs have likewise not, as to their class claims, proved that they are entitled to relief under a disparate treatment theory.

in question was intentional and was motivated by racial prejudice. *Idem.*

The previous discussion concerning plaintiffs' claims asserted under Title VII is likewise applicable to plaintiffs' § 1981 claims. This Court has found no discriminatory impact so as to permit plaintiffs to recover under Title VII, either under their individual claims or under their class claims. The same findings support the conclusion that plaintiffs have not proven any discriminatory motive or intent on the part of the County to permit recovery against the County under § 1981 on any of the claims asserted here.

Accordingly, this Court finds that plaintiffs' § 1981 claims likewise lack merit.

### IX

#### Conclusion

For the reasons stated, judgment is hereby entered in favor of the defendant, with costs.